# DOAR RIECK KALEY & MACK

ATTORNEYS AT LAW

JOHN JACOB RIECK, JR.
JOHN F. KALEY
WALTER MACK
EDWARD SCARVALONE

SPECIAL COUNSEL
JOHN DOAR

OF COUNSEL
AMY ROTHSTEIN
EILEEN MINNEFOR
DAVID RIVERA
PAUL E. MINNEFOR

ASTOR BUILDING
7TH FLOOR
217 BROADWAY
NEW YORK, N.Y. 10007-2911

TELEPHONE: (212) 619-3730
FACSIMILE: (212) 962-5037
e-mail: firm@doarlaw.com

March 5, 2008

**BY HAND**

Hon. Kimba M. Wood
Chief Judge
United States District Court
  for the Southern District of New York
500 Pearl Street
New York, New York 10007

> Re: Cabral v. United States
> Docket No. 08CV00296
> and
> United States v. Guido Cabral
> Docket Nos. S1 92 Cr. 315
>      96 Cr. 836
>      01 Cr. 1112

Dear Chief Judge Wood:

I am writing in connection with a *pro se* habeas petition filed by Guido Cabral and assigned Docket No. 08 CV 00296. Mr. Cabral presently is incarcerated at a facility out of this district under sentences imposed previously by former Chief Judge Mukasey under Docket Nos. S1 92 Cr. 315, 96 Cr. 836 and 01 Cr. 1112.

I had been appointed under the Criminal Justice Act to represent Mr. Cabral in each of those criminal dockets upon a *Crosby* remand by the Second Circuit.

Mr. Cabral has forwarded to me a copy of Your Honor's Order dated January 14, 2008, which gave Mr. Cabral 60 days – or until March 14, 2008, either to submit an amended § 2241 petition or request that his action be withdrawn and advise whether he intends to bring a new § 2241 petition in the United States District Court for the Western District of Texas.

Hon. Kimba M. Wood
March 5, 2008
Page 2

        The Court's Order suggested that the 60 day period could be extended for good cause.

        I am writing on Mr. Cabral's behalf to request an extension of the sixty (60) day period referenced in the Court's Order for the reasons set forth below.

        As noted above, I had been appointed to represent Mr. Cabral in the three criminal matters referenced above, which are at the heart of Mr. Cabral's current § 2241 petition. The matter underlying Mr. Cabral's petition is a simple one which can be rectified under Fed. R. Crim. P., Rule 36, which permits a court at any time to remedy a clerical error, which is what has happened here. While the Court's Order references that Mr. Cabral seeks a "correction of his release date," the reality is that Mr. Cabral seeks to remedy a clerical error in the preparation of the judgment issued on his resentencing in 2006, as the following facts and background demonstrate.

        Mr. Cabral was convicted under the aforesaid criminal dockets and sentenced by former Chief Judge Mukasey. On March 29, 2004, Mr. Cabral was sentenced on Docket No. 92 Cr. 315 to 151 months imprisonment to run consecutive to the term imposed on Docket No. 96 Cr. 836 and concurrent with the sentence imposed on Docket No. 01 Cr. 1112. On March 29, 2004, Mr. Cabral was sentenced on Docket No. 96 Cr. 836 to 12 months imprisonment to run consecutive to the term imposed on Docket 92 Cr. 315 and concurrent with the term imposed on Docket No. 01 Cr. 1112. On March 29, 2004, Mr. Cabral was sentenced on Docket No. 01 Cr. 1112 to 163 months imprisonment to run concurrent with the sentences imposed under the other two Docket Numbers. The total sentence was 163 months.

        Mr. Cabral then appealed his convictions and sentences. Subsequent to the Circuit's decision in *Crosby*, Mr. Cabral's cases were remanded to the District Court to determine if resentencing, in light of *Crosby*, was appropriate. It was after the remand that I was appointed to represent Mr. Cabral in the District Court.

        After familiarizing myself with the matter, I made a sentencing submission to Chief Judge Mukasey requesting that Mr. Cabral be resentenced and that on resentencing the Court impose a sentence less than the 163 months initially imposed. After considering my submission and the submission of the Government, and after hearing oral argument, on February 28, 2006, Chief Judge Mukasey imposed a total overall sentence of 132 months imprisonment, down from the 163 months initially proposed in 2004.

        What is creating the current issue is that the new judgment prepared after the resentencing only refers to the single Docket No. 01 Cr. 1112 when it should have listed all three Docket Numbers. Further, it also does not specify accurately the sentence actually announced in open court at sentencing. Because of these clerical errors, the Bureau of Prisons ("BOP") has

Hon. Kimba M. Wood
March 5, 2008
Page 3

calculated a release date based on the original sentence of 163 months when the reality of what
occurred is that Chief Judge Mukasey reduced the overall sentence to 132 months. Had the new
judgment referenced all three dockets, the BOP would correctly calculate a release date based on
the new sentence imposed which was a total of 132 months. As stated on the record at his
resentencing in 2006, that broke down to 120 months on the narcotics charge and a consecutive
12 months for the bail jumping conviction.

    From a constitutional standpoint, there is constitutional error here because the new
judgment, to the extent it does not reference all three dockets and identify 120 months as being
imposed on the narcotics conviction and 12 months consecutive for the bail jumping conviction,
is at odds with the oral sentence pronounced in open court.

    A judgment which does not accurately reflect the actual sentence imposed on the
record in open court constitutes a violation of a defendant's rights to due process and of a
defendant's right to be present at sentencing.

    Rule 43(a) mandates that a defendant be present at the imposition of sentence.
Fed. R. Crim. P., Rule 43(a). *See United States v. Thomas*, 299 F.3d 150, 152 (2d Cir. 2002).
Rule 43's requirement that the defendant be present for his sentence is violated when a Judgment
conflicts with the oral sentence. *United States v. Werber*, 51 F.3d 342, 347 (2d Cir. 1995). That
is because "it is the oral sentence which constitutes the judgment of the court, and which is
authority for the execution of the court's sentence." *United States v. Marquez*, 506 F.2d 620,622
(2d Cir. 1974). The written judgment, on the other hand, is "nothing more than mere evidence of
the sentence imposed orally in court by the judge." *Id.* For this reason, "[w]here an
unambiguous oral sentence conflicts with the written judgment, the constitutional right of a
defendant to be present at sentencing dictates that the oral pronouncement of sentence must
control." *United States v. A-Abras Inc.*, 185 F.3d 26, 29 (2d Cir. 1999).

    Here, for the reasons stated, the oral pronouncement at sentencing conflicts
directly with the new judgment as prepared. Whereas the oral pronouncement at sentencing
expressly directed an overall sentence of 132 months for all three dockets, the written Judgment
merely notes one docket number, to wit, 01 Cr. 1112. In such circumstances, the "oral
pronouncement of sentence must control." *Id. See also United States v. DeMartino*, 112 F.3d
75, 78-81 (2d Cir. 1997) (vacating written judgment imposing 63-month term of imprisonment
when the court had orally pronounced a 48-month term; court not permitted to enter a conflicting
written judgment and "change its mind about the appropriateness of the sentence").

    Finally, pursuant to Fed.R.Crim.P., Rule 36, a district judge, at any time, may
correct the written judgment so that it conforms with the oral sentence pronounced by the court.
*See Werber*, 51 F.3d at 347. That correction should be made now and I will file a formal motion
in this court to remedy the clerical error.

Hon. Kimba M. Wood
March 5, 2008
Page 4

Because former Chief Judge Mukasey has left the bench, I would ask that Your Honor consider the motion given the Court's familiarity with the issue based on Mr. Cabral's §2241 petition.[1]

Accordingly, I would request that the Court extend the time for Mr. Cabral to file an amended §2241 petition until such time as the Court has an opportunity to consider the motion under Rule 36. I will file that motion within two weeks.

For the Court's ease of reference, I am enclosing the following:

Exhibit 1. The transcripts of the original sentencing proceedings before Chief Judge Mukasey dated January 28, 2004 and February 6, 2004.

Exhibit 2. A copy of the Second Circuit's *Crosby* remand.

Exhibit 3. A copy of the transcripts of the sentencing proceedings on remand.

Exhibit 4. A copy of the sentencing submission which I made to Chief Judge Mukasey on Mr. Cabral's behalf.

Exhibit 5. A copy of the transcripts of the sentencing proceedings on remand held on February 9, 2006 and February 28, 2006.

Exhibit 6. A copy of the judgment on resentencing which fails to reference all three Dockets.

Exhibit 7. A copy of this Court's Order dated January 14, 2008.

Thank you for your Honor's consideration of the enclosed and this request.

Respectfully yours,

John F. Kaley

---

[1] AUSA Harry Sandick, who had been assigned this matter, has left the United States Attorney's Office. Accordingly, I will send a copy of this letter to the Chief of the Criminal Division in that Office and alert him to the need to have the matter assigned to someone in that office.

Hon. Kimba M. Wood
March 5, 2008
Page 5

cc:    Mr. Guido Cabral
       Register No. 10612-014
       R.C.D.C. II
       P.O. Box 1560
       Pecos, Texas 79772

       Pro Se Clerk
       United States District Court
       500 Pearl Street
       New York, New York 10007

       Guy Petrillo, Esq.
       Assistant United States Attorney
       Chief, Criminal Division
       United States Attorney's Office
       1 St. Andrew's Plaza
       New York, New York 10007

Exhibit 1

41SCCABC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4           v.                               S1 92 Cr. 00315 (MBM)
                                             96 Cr. 00836(MBM)
5                                            01 Cr. 01112(MBM)

6   GUIDO CABRAL,

7           Defendant.

8   ------------------------------x

9
                                             January 28, 2004
10                                           10:00 a.m.

11
    Before:
12
                    HON. MICHAEL B. MUKASEY,
13
                                             Chief Judge
14

15                        APPEARANCES

16  DAVID N. KELLEY,
        United States Attorney for the
17      Southern District of New York,
    HARRY SANDICK,
18      Assistant United States Attorney.

19
    ARANDA & GUTTLEIN,
20      Attorneys for Defendant,
    JORGE GUTTLEIN,
21      of Counsel.

22
    MIRTA HESS,
23      Official Spanish Interpreter.

24

25

41SCCABC

1          (Case called)

2          THE COURT:  Yes.

3          MR. GUTTLEIN:  Your Honor, may I be heard?

4          THE COURT:  Yes.

5          MR. GUTTLEIN:  I know this case has a long tortured

6    history, so what I am going to be requesting is a very brief

7    adjournment of sentencing for two reasons:  One, the government

8    on an issue which we brought up first in December of 2003, the

9    Lauerson case, the government submitted by fax a very lengthy

10   reply to that issue, apparently also pointing out that

11   apparently that case, Lauerson and Jackson, related cases up

12   for rehearing in front of the Second Circuit on the

13   government's position.

14          Number two, Judge, with respect to just on the human

15   level, his family called, his wife with a young child, because

16   of weather conditions, she lives upstate in Westchester

17   specifically, and finds it very difficult to be here this

18   morning, to make it downtown here, and I know from Mr. Cabral

19   that Mr. Cabral would want her here along with the rest of his

20   family.

21          So I respectfully request that your Honor give me the

22   opportunity to submit a response to the government.  I am not

23   asking for much time, a week at the most, and that way we could

24   reschedule for the sentencing.

25          MR. SANDICK:  Your Honor, I just wanted one point on

41SCCABC

1   the Laueerson issue.  When we met last time the court

2   indicated, I believe, maybe not a decision but a reluctance

3   perhaps to grant the government's application for a two-point

4   enhancement on the assault count.  If that application is not

5   granted, the assault count, as it were, drops out of the

6   grouping analysis, and Mr. Cabral would then be sentenced

7   exclusively based on the base offense level for the drug

8   quantity which I believe Mr. Guttlein's objection was overruled

9   at the last conference, and then a two-point enhancement for

10  the bail jumping and the assault count, because it's more than

11  three levels or more below would drop out completely.  That in

12  the government's view substantially negates the relevance of

13  Lauerson to the sentencing because Lauerson is about

14  multi-cumulative enhancements, one enhancement for bail

15  jumping, certainly doesn't have anything to do with Lauerson

16  and --

17              THE COURT:  It does not, and Lauerson is kind of a

18  paradoxical case because it amounts to a sort of if you are bad

19  enough you might qualify for a departure.  That sort of is what

20  it adds up to.

21              But in any event the court has to consider whether

22  some series of enhancements is sufficient that it places the

23  case outside the heartland and then would qualify a defendant

24  for a departure.

25              I don't think that whether I were to enhance for the

41SCCABC

1   assault or not, that this case would to that, and so in no

2   event would I grant a departure on the Lauerson, in any case,

3   so I am mystified as to what I am suppose to consider.

4           MR. GUTTLEIN:  We had requested the court to consider

5   that, and the government then responded saying it would be

6   inapplicable, and as I mentioned, a very lengthy memorandum

7   on Monday which I have not an opportunity to respond to, I

8   would ask the court to give me that opportunity.

9           THE COURT:  What I am saying is that even if Lauerson

10  is applicable, I am not inclined to depart in this case

11  particularly because I would not grant the enhancement for the

12  assault.  Although I would grant the enhancement for the bail

13  jumping such that what we are talking about, I think, is an

14  offense level of 35; is that right?

15          MR. SANDICK:  Your Honor, I believe it would be 35 if

16  the enhancement is granted for the assault -- the obstruction

17  enhancement is granted on the assault count, and I believe it

18  would be 34 if it were not granted.  Level 32 for the drugs and

19  two levels for the bail jumping takes it to level 34, and the

20  probation report basically left open the question of the

21  obstruction on assault count.

22          I then did a grouping analysis and determined,

23  correctly in the government's view, that because the level for

24  the first group, the cocaine distribution and bail jumping

25  group was 34 and the level for the assault without an

41SCCABC

1    obstruction enhancement was 25, those groups being fine levels

2    apart, it drops out and leaves a level 34 with no reduction.

3                THE COURT:  So then it would be a level 34.

4                MR. SANDICK:  Correct, your Honor, with a range of 151

5    phone to 108 months, the sentence on bail jumping count, but I

6    believe assault are required to run consecutive to the sentence

7    on the bail jumping count.

8                MR. GUTTLEIN:  I think it may be an open question,

9    Judge.  One of the things I would like to address is when you

10   are giving consecutive sentence on bail jumping, which would

11   also be a two-point enhancement for obstruction for the same

12   conduct, it would not arguably be in the language of

13    what Lauerson was speaking about.

14               THE COURT:  I am sorry, I don't understand what you

15   are saying.

16               MR. GUTTLEIN:  Basically talking -- its the same

17   conduct, double the sentence.

18               MR. SANDICK:  Your Honor, that factor couldn't take

19   out of the heartland because every bail jumping is required by

20   the guidelines very specifically to result in a two-level

21   enhancement on the obstruction guideline.  Equally clear in the

22   statute is that a failure to appear should result in a

23   consecutive sentence to the underlying sentence.

24               So not only is what Mr. Guttlein saying not out of the

25   heartland, it actually applies in every single case of bail

41SCCABC

1    jumping in federal courts across the country and was directly

2    considered by the Commission when they recommended the

3    two-point enhancement in the obstruction guideline be used for

4    bail jumping.

5        MR. GUTTLEIN:  Your Honor, they also talked of getting

6    rid of a minus three for acceptance on that, so I think in view

7    of Lauerson, there is an argument there.

8        THE COURT:  Well, he went to trial.

9        MR. GUTTLEIN:  I am talking the drug counts, Judge,

10    not the assault.

11        MR. SANDICK:  Your Honor, it's true he pled guilty in

12    the drug count, but he failed to appear for sentence and was at

13    large for nine years.  Then he committed the assault on the

14    officers who tried to arrest him.

15        THE COURT:  That doesn't bespeak acceptance of

16    responsibility.

17        MR. SANDICK:  And the guidelines also said it's the

18    unusual case where the defendant gets an obstruction

19    enhancement, which is clearly required in his underlying 1992

20    and 1996 cases when grouped together.  It's the unusual case

21    where you can get that and also get acceptance, and there has

22    been nothing shown here to suggest this is unusual.  This is

23    just somebody who didn't come back and tried to evade

24    prosecution, and was completely remorseless about it.  When he

25    was arrested he didn't just submit, he assaulted the people who

41SCCABC

1    came to arrest him and ultimately brought him back here.

2         MR. GUTTLEIN:  Your Honor, I don't believe that is

3    strictly the standard for acceptance of responsibility.  He

4    certainly did acknowledge his guilt at the time that he pled

5    for reasons which touched on various submissions in court and

6    his further conduct is already being hit for that in other

7    ways, so that is what I am talking about, your Honor, in the

8    way the court noted.

9         Lauerson and Jackson basically say you are getting

10   with three points additional because you are not getting

11   acceptance, you are getting hit with two points for

12   obstruction, and that is the same conduct for bail jumping

13   which is consecutive months.

14        MR. SANDICK:  Again, your Honor, that is much like the

15   other argument.  That is hardly outside the heartland.  It's

16   explicitly contemplated by the guidelines, I can even read the

17   application note.  It's section 3E.1.1 which states in

18   application note 4 --

19        THE COURT:  I am sorry?

20        MR. SANDICK:  3E1.1.

21        MR. GUTTLEIN:  Can I get my guideline, Judge?

22        MR. SANDICK:  It's application Note 4.  I will read it

23   for the record.  Conduct resulting in an enhancement under

24   3C1.1, which is the obstruction guideline, ordinarily indicates

25   that the defendant has not accepted responsibility for his

41SCCABC

1    criminal conduct.  There may, however, be extraordinary cases

2    in which adjustments under both the obstruction guideline and

3    the acceptance guideline may apply, this just in no way is an

4    extraordinary case, your Honor, for the reasons that we have

5    been discussing.  It's certainly not extraordinary in their

6    granting acceptance.  If anything it's extraordinary in the

7    opposite direction.

8              THE COURT:  Mr. Guttlein?

9              MR. GUTTLEIN:  Your Honor, we have argued that in fact

10   in our view this is the type of situation that Jackson and

11   Lauerson courts were envisioning, that when you have multiple

12   punishments for the same conduct for which basically you are

13   running consecutive sentences, and that is really what you are

14   talking about, that is the way the guidelines or the statutes

15   work.  That is why I'd like to have an opportunity to at least

16   respond to the government's letter.

17             MR. SANDICK:  Your Honor, I think this has already

18   been discussed, but it's not just that there is some

19   overlap.  It's that overlap somehow operates to take it out of

20   the heartland and make it an unusual case of a kind or degree

21   not considered by the Commission.

22             The idea that somebody who jumps bail on a case and

23   therefore loses acceptance of points from the application note

24   we just read, and then gets points for obstruction because of

25   the grouping analysis that's been discussed previously, not

41SCCABC

1    only is it something that the Commission didn't anticipate,

2    it's something the Commission very clearly anticipated and

3    decided, and decided that people in Mr. Cabral's situation have

4    to have that result.  It's a significant swing, but I think

5    that's the intention of the Commission that it be the situation

6    for someone who fails to show up at trial or representing, I

7    should say, that there be an significant punishment.

8            It mirrors the requirement in Section 3146 that the

9    sentence be run consecutive, the defendants who do this have to

10    be punished, your Honor, in excess of the defendants who don't

11    engage in this sort of activity.

12            THE COURT:  Lauerson requires at a minimum that a

13    series of enhancements produce a result that is both outside

14    the heartland and not contemplated by the Sentencing

15    Commission.  Where the Sentencing Commission has an application

16    note which tells us that the usual case is what it is here,

17    that that it is the result of what it is here, it's kind of

18    difficult to say that what we are dealing with is a result

19    wasn't contemplated.

20            In any event, I would not be inclined to depart

21    downward, so frankly, I don't see the purpose of putting this

22    off any further.  This case has been going on for a long time,

23    and although I will always give a lawyer an opportunity to

24    respond to something when there is a point that is raised, but

25    I think this is not about simply getting in the last word.  You

41SCCABC

1  told me what your argument is and I am afraid I don't see it.

2          MR. GUTTLEIN:  That is why I'd like to have the

3  opportunity, Judge, very brief one, to at least argue it better

4  than I have now.  Again, I got it Monday, and the government

5  submitted a very lengthy submission to this court.

6          THE COURT:  What date do you want?  When can you get

7  your letter in?

8          MR. GUTTLEIN:  I can get it in, Judge, probably

9  Tuesday at the latest.

10          THE COURT:  February 6.

11          MR. GUTTLEIN:  9:15, your Honor?

12          THE COURT:  Yes.

13          MR. GUTTLEIN:  Thank you very much, Judge.  I

14  appreciate it.

15          THE COURT:  Be aware, as far as the family is

16  concerned, I have read the letters and there have been a number

17  of letters from the family.  I don't generally hear from family

18  members, and I will not hear from family members at sentence.

19          MR. GUTTLEIN:  No, Judge.  It wasn't that.  It's

20  basically if the man is being sentenced, generally if he has a

21  close family they want to be present.  Unfortunately, due to

22  weather conditions they couldn't be here.  I thank the court

23  for its consideration.

24          Thank you again.

25                              -0-

4264CABS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA

4          v.                          S1 92CR315(MBM)
                                        96CR404(MBM)
5  GUIDO CABRAL,

6              Defendant.

7  ------------------------------x

8                                      New York, NY
                                        February 6, 2004
9                                      10:00 a.m.

10  Before:

11                  HON. MICHAEL B. MUKASEY

12                                      District Judge

13                      APPEARANCES

14  DAVID N. KELLEY
        United States Attorney for the
15      Southern District of New York
    HARRY SANDICK
16      Assistant United States Attorney

17  JORGE GUTTLEIN
        Attorney for Defendant
18
    ALSO PRESENT:
19  Nicholas Luttinger (Spanish Interpreter)

20

21

22

23

24

25

4264CABS

```
 1                (Case called)

 2                (Through interpreter)

 3                THE COURT:  We had adjourned this because you wanted

 4       to submit additional papers on the issues of double counting,

 5       whether there should be a departure under Lauersen and Jackson.

 6       I have not seen those papers.

 7                MR. GUTTLEIN:  Your Honor, the Lauersen issue, your

 8       Honor, unfortunately the government was arguing the case law so

 9       far in the Second Circuit with respect to obstruction and

10       acceptance, but my argument would be the same as before.  I

11       have no case law to support, in fact, Lauersen is a rethinking,

12       that would give the court discretion.  In terms of finding case

13       law, Lauersen and the other case Jackson just came down.  It's

14       on rehearing en banc.  The government has requested a hearing

15       before the Second Circuit.  There is no case law to support

16       that argument, although I urge the court to consider it.  I do

17       believe Lauersen is only with respect to the ability of the

18       court to consider in its discretion a departure in situations

19       like this where you have both acceptance and obstruction

20       enhancements; in other words, acceptance has been turned away

21       on both indictments.

22                THE COURT:  I understand the point.

23                Have you reviewed the presentence report with

24       Mr. Cabral.

25                MR. GUTTLEIN:  Yes, your Honor.
```

4264CABS

1     THE COURT:  Is there anything you want to tell me

2  other than what we talked about already.

3     MR. GUTTLEIN:  One issue I think you covered at the

4  last conference, the question is the drug quantity, your Honor.

5  We have argued basically that the drug quantity was enhanced

6  based on proffers by Mr. Cabral that increased the drug amount.

7  We argued before your Honor that there is no evidence and that

8  there is still a burden on the government for a preponderance

9  of the evidence to indicate that drug amount other than what

10  was recovered from Mr. Cabral when he was arrested at the time.

11  There is no other evidence that I know of.  The government has

12  argued that in fact Mr. Cabral basically had lied and is not

13  worthy of any belief, so in other words, I don't know how they

14  could argue that his testimony or his statement would carry a

15  preponderance of the evidence.

16     THE COURT:  It's very simple.  The argument is when he

17  makes a statement that's clearly against his own interest, you

18  can take it at face value; when he makes a self-serving

19  statement, you can't.  There is no controversy.

20     MR. GUTTLEIN:  But there is no other indicia or

21  evidence or any other indication that was buy & bust basically

22  in Connecticut a long time ago, obviously, judge, I think in a

23  shopping center.  That was all there was to this case.  There

24  was nothing else.

25     THE COURT:  There was ample indication this was not a

4

4264CABS

1   first-time matter certainly out of your client's own mouth.

2           MR. GUTTLEIN:  That's correct.  At proffers when in

3   fact he signed the cooperation agreement, I was not

4   representing him in the cooperation aspects of that, my

5   information, I don't dispute those statements were made.

6           THE COURT:  I understand your point.  I don't think

7   that it's a valid one.  Is there anything you want to tell me

8   with respect to the sentence more generally.

9           MR. GUTTLEIN:  Yes, your Honor.  I would ask the court

10  to consider the lowest sentence within the applicable

11  guidelines.  I believe the court made rulings with respect to

12  the enhancements on the government's argument that he in fact

13  obstructed justice on the assault trial.

14          THE COURT:  I denied that.

15          MR. GUTTLEIN:  Yes, judge.  With respect to that, your

16  Honor, I still believe the category that he is in really

17  overemphasizes his culpability in this case.  I would ask the

18  court to take consideration of this.  Mr. Cabral was working.

19  He obviously has a drug habit, has had one for a very long

20  period of time.  He is facing imminent deportation once he

21  finishes his sentence.  I ask the court to give him the low end

22  of the guidelines range.

23          THE COURT:  The low end of the guidelines range when

24  you factor in the bail judgment is 163 months.

25          MR. GUTTLEIN:  Yes, your Honor.

4264CABS

1            THE COURT:  That's what I plan to do.

2            Mr. Cabral, is there anything you want to tell me

3     before I impose sentence.

4            THE DEFENDANT:  Yes, your Honor.  I would like to say,

5     I would like to ask your pardon for everything that I have

6     done, all the bad things I have done.  I would like to ask for

7     your compassion, and I would like an opportunity to return to

8     my family.  That's all I have to say, your Honor.

9            THE COURT:  Unfortunately, I can't give out pardons;

10    that comes in another tribunal.  As far as compassion, I can

11    give you the most compassionate sentencing the guidelines

12    allow.

13           As to indictment 92CR315, Counts 1 and 2, Mr. Cabral

14    is committed to the custody of the Attorney General or his

15    authorized representative to a period of 151 months.  With

16    respect to indictment 01CR1112, Counts 1 and 2, Mr. Cabral is

17    committed to the custody of the Attorney General or his

18    authorized representative to a period of 147 months.  That

19    sentence is concurrent with the sentences previously imposed

20    Counts 1 and 2 of the 92CR315 indictment.  With respect to

21    96CR836, one count, Mr. Cabral is committed to the custody of

22    the Attorney General or his authorized representative for a

23    period of 12 months consecutive to the sentences imposed on the

24    other two indictments, for a total of 163 months.

25           He will be placed on supervised release for a period

4264CABS

1    of 5 years.  I find he is without funds to pay either a fine or

2    the cost of imprisonment.  Neither of those will be imposed. I

3    think the issue of the cost of supervised release is moot

4    because he will be subject to deportation.  There is a

5    mandatory special assessment totaling $400 that I must impose

6    and do impose.  The terms of supervision will include obediance

7    to all lawful orders of the successor to the Immigration and

8    Naturalization Service.

9              Are there any open counts.

10             MR. SANDICK:  There are no open counts, your Honor.

11             THE COURT:  I will tell Mr. Cabral that he has the

12   right to appeal if he believes there has been any irregularity

13   in connection with either his prosecution or sentence.  If he

14   cannot afford counsel to prosecute an appeal, one will be

15   appointed at public expense to represent him.

16             MR. SANDICK:  I want to correct myself.  There is an

17   underlying count on the original information which according to

18   the presentence report was S1 filed in 1992.

19             THE COURT:  That's dismissed.

20             MR. SANDICK:  Thank you, your Honor.

21             MR. GUTTLEIN:  Your Honor, he respect fully requests

22   the court recommend his incarceration be in a facility in the

23   metropolitan area, specifically Fort Dix, if the court would.

24             THE COURT:  I will recommend he be sent to a facility

25   that's as close to New York as possible, consistent with his

4264CABS

1    security classification and the sentence I imposed.

2         MR. GUTTLEIN:  Obviously he has had a drug problem for

3    a long time.  We specifically ask the court recommend his

4    placement in a drug program.  That cannot be done without the

5    court's recommendation.

6         THE COURT:  I will recommend that.

7         MR. GUTTLEIN:  Thank you.

8         THE COURT:  Is there anything else.

9         MR. GUTTLEIN:  No, your Honor.

10        MR. SANDICK:  No, your Honor.

11        THE COURT:  Thank you.

12                              -   -   -

Exhibit 2

138 Fed.Appx. 359                                                                                   **Page 3**
138 Fed.Appx. 359
**(Cite as: 138 Fed.Appx. 359)**

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Second Circuit Rules § 0.23. (FIND CTA2 s 0.23.)

United States Court of Appeals,
Second Circuit.
UNITED STATES of America, Appellee,
v.
Guido **CABRAL**, also known as Martin Rivera,
Defendant-Appellant.
Docket No. 04-1736-CR.

June 29, 2005.

Appeal from the United States District Court for the Southern District of New York (Michael B. Mukasey, C.J.).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court be and it hereby is AFFIRMED in part and the case REMANDED.

Harry **Sandick**, Assistant United States Attorney, for David N. Kelley, United States Attorney for the Southern, District of New York (Robin L. Baker, of counsel), New York, NY, for Appellee.

Howard M. Simms, New York, NY, for Defendant-Appellant.

PRESENT: CALABRESI, KATZMANN, and B.D. PARKER, Circuit Judges.

SUMMARY ORDER
Defendant-appellant Guido **Cabral** ("Cabral") appeals from a judgment and sentence entered

following his conviction (1) for conspiracy to distribute, and to possess with intent to distribute, five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841, 846; (2) for bail jumping, in violation of 18 U.S.C. § 3146; (3) for possession with intent to distribute 24 grams of cocaine, in violation of 21 U.S.C. § 841; and (4) for assaulting and causing bodily injury to a federal officer, in violation of 18 U.S.C. § 111(a)(1), (b). We assume the parties' familiarity with the facts, the procedural history, and the scope of the issues presented on appeal.

Cabral correctly challenges the validity of his sentence following the Supreme Court's decision in *United States v. Booker,* --- U.S. ----, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Since, however, this argument was not presented below, we \*360 remand this case to the district court for consideration of resentencing pursuant to *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).

We have considered all of **Cabral's** other arguments and find them to be without merit. **Cabral's** guilty plea was adequately supported by a factual record establishing all the elements of the offense. *See, e.g., United States v. Maher,* 108 F.3d 1513, 1520-21 (2d Cir.1997); *see also United States v. Richards,* 302 F.3d 58, 67 (2d Cir.2002). The introduction of certain hearsay testimony did not violate the Confrontation Clause, for the hearsay statements **Cabral** avers to (including a law enforcement official's contemporaneous declarations of pain in the midst of a violent struggle with **Cabral**) were decidedly non-testimonial under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Finally, we decline to address **Cabral's** arguments regarding an aggravated assault enhancement under the Guidelines, for that enhancement, even if erroneously applied (and we express no opinion whatsoever on the question), had no bearing on **Cabral's** ultimate sentence. *See United States v. Bermingham,* 855 F.2d 925, 931 (2d Cir.1988).

The judgment of the district court is AFFIRMED, and the case REMANDED for consideration of resentencing.

138 Fed.Appx. 359

Briefs and Other Related Documents (Back to top)

. 04-1736 (Docket) (Apr. 05, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

138 Fed.Appx. 359
**(Cite as: 138 Fed.Appx. 359, \*360)**

END OF DOCUMENT

Exhibit 3



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 8, 2005

**BY HAND**

Honorable Michael B. Mukasey
Chief Judge, United States District Court
Southern District of New York
500 Pearl Street, Room 2240
New York, New York 10007

RECEIVED

DEC - 9 2005

**DOAR RIECK & MACK**

      Re:   United States v. Guido Cabral
                S1 92 Cr. 315 (MBM)
                96 Cr. 836 (MBM)
                01 Cr. 1112 (MBM)

Dear Chief Judge Mukasey:

      The Government respectfully submits this letter in response to the Court's request for briefing relating to whether this Court should resentence Cabral in light of the recent decisions in United States v. Booker, 125 S. Ct. 738 (2005) and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). For the reasons set forth below, Cabral should not be resentenced.

**A.    Background**

    **1.    The Offense Conduct[1]**

        a.    Cabral's 1991 Cocaine Conspiracy Offense

      In January 1991, a confidential informant working for the Drug Enforcement Administration ("DEA") advised DEA agents that an individual named Steve Howe of Derby, Connecticut was receiving cocaine from a source in New York City.[2]  (PSR ¶ 13).  In response to

---

      [1] This rendition of the offense conduct was drawn substantially from the Government's brief on appeal.

      [2] "Tr." refers to the transcript from the November 12, 2002 bench trial; "GX" refers to the Government's exhibits at that trial; and "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Cabral's

The Honorable Michael B. Mukasey
December 8, 2005
Page 2

this information DEA agents and task force officers initiated surveillance at Howe's residence on January 29, 1991. (PSR ¶ 14). The agents and officers observed Howe leave his house and travel to a nearby McDonald's restaurant in Stamford, Connecticut. (PSR ¶ 15). While in the parking lot, Howe waved to Cabral; Cabral, in response, held up and showed Howe a black plastic bag. (PSR ¶ 15). Cabral and Howe then got into Cabral's car. (PSR ¶ 15). At this point, DEA agents and other law enforcement personnel identified themselves and removed Cabral and Howe from Cabral's car. (PSR ¶ 16). Agents searched Cabral's car and found a black plastic bag that contained a gift-wrapped package. The package contained cocaine, and subsequent laboratory analysis determined that the cocaine weighed 1003 grams. (PSR ¶ 16).

After Cabral's arrest, he made a post-arrest statement to law enforcement personnel. In this statement, Cabral said, in substance and in part, the following: that he knew Howe for approximately one month; that he planned to deliver the kilogram of cocaine to Howe in exchange for money; that he had been selling drugs for approximately one and one-half years; and that he sold approximately 5 kilograms of cocaine during that time period. (PSR ¶ 17). Cabral later admitted to the Probation Office that he had been selling cocaine for 18 months prior to his January 1991 arrest. (PSR ¶ 34). Cabral also admitted in post-arrest meetings with the Government that he continued to deal drugs after his arrest in Connecticut, and that he dealt, in all, approximately 900 grams of cocaine between December 1991 and June 1992. (PSR ¶ 18).

           b.      Cabral's Failure To Appear

At the conclusion of his guilty plea to Superseding Information S1 92 Cr. 315 (MBM), which charged Cabral with the narcotics offenses discussed above, the Court advised Cabral that he was required to appear for sentencing, either on October 19, 1992, or on any subsequent date set by the District Court. (A, 78). The Court further told Cabral that "[i]f you don't appear for sentence, that's a separate crime which is bail jumping which carries a five year penalty and $250,000 fine . . . [i]n addition to the penalties for the crime to which you have pleaded guilty." (A. 79).

On November 19, 1992, Cabral failed to appear at a scheduled court conference. (PSR ¶ 19). A bench warrant was issued for Cabral's arrest. (PSR ¶ 20). Later, on September 23, 1996, Cabral was charged in Indictment 96 Cr. 836 (MBM), which alleged a single count of failure to appear, in violation of Title 18, United States Code, Section 3146. (PSR ¶ 19).

On April 10, 2001, Cabral was arrested on drug-related charges by the New York Drug Enforcement Task Force in the Washington Heights neighborhood of New York, New York. (PSR ¶¶ 20, 22). After his arrest, law enforcement personnel determined that Cabral had two outstanding arrest warrants arising out of his failure to appear. (PSR ¶ 20). On May 9, 2001,

---

sentencing.

The Honorable Michael B. Mukasey
December 8, 2005
Page 3

Cabral was taken into federal custody. (PSR ¶ 21).

        c.     Cabral's 2001 Cocaine Possession And Assault Offenses

On April 10, 2001, Detectives Robert Del Rio, Scott Fowler and Patrick O'Leary of the New York City Police Department ("NYPD") were conducting a narcotics investigation near West 169th Street in the Washington Heights neighborhood in New York, New York. (Tr. 8-9, 23). All three detectives were at that time members of the New York Drug Enforcement Task Force ("NYDETF"), which is a joint state-federal task force composed of agents of the DEA, as well as members of the NYPD and the New York State Police. (Tr. 7, 21-23). As members of NYDETF, all three detectives were deputized as federal agents. (Tr. 8, 22).

Based on their prior investigation, Detective Del Rio had established surveillance at the intersection of Amsterdam Avenue and West 169th Street. (Tr. 9). On three or four prior instances, Detective Del Rio had seen individuals standing at that street corner. (Tr. 9). Detective Del Rio believed (based on information that he learned earlier in the investigation) that these individuals were "steerers" who met with narcotics buyers and then directed them down West 169th Street in order to purchase cocaine. (Tr. 9). Detectives Fowler and O'Leary were approximately one block away from the intersection where Detective Del Rio had established surveillance. (Tr. 10-11, 23).

At approximately 6:00 p.m., Detective Del Rio observed Guido Cabral speaking with Isidrio Paredes, a "steerer," on the southwest corner of Amsterdam Avenue and West 169th Street. (Tr. 11). After Cabral spoke with Paredes for approximately one minute, Cabral crossed to the northwest corner and then proceeded westbound down West 169th Street. (Tr. 11). Detective Del Rio notified Detectives Fowler and O'Leary about his observations and provided them with a description of Cabral. (Tr. 11, 24). A few minutes later, Cabral walked back down West 169th Street towards Amsterdam Avenue, and he then started walking northbound. (Tr. 11).

Approximately three to five minutes later, Detectives O'Leary and Fowler stopped Cabral. (Tr. 12, 24). The detectives initially had followed Cabral from 170th Street and Amsterdam Avenue to Edgecomb Avenue. (Tr. 24). Cabral entered a van on Edgecomb Avenue, and Detectives O'Leary and Fowler approached the van, identified themselves, and asked both Cabral and the driver of the van to step out of the van. (Tr. 24-25). Cabral, who was seated in the front passenger's seat, stepped out of the van when Detective O'Leary approached him. (Tr. 24-25). Detective O'Leary did a protective frisk of Cabral and felt a bulge in Cabral's left jacket pocket. (Tr. 25). When Detective O'Leary asked Cabral what was in his pocket, Cabral told him that it was cocaine. (Tr. 25). At that point, Detective O'Leary removed the bulge from Cabral's jacket pocket and arrested Cabral. (Tr. 25-26).

The Honorable Michael B. Mukasey
December 8, 2005
Page 4

Cabral's cocaine was packaged into several separately wrapped tin foils. (Tr. 14; GX 11-16). Cabral told Detective O'Leary that he purchased drugs at that location twice a week. (Tr. 79). Detective Del Rio, who was qualified at trial as an expert in narcotics distribution (Tr. 6), testified that the tin foil wrapping was an indication of Cabral's intention to resell the cocaine. In all, Cabral possessed an approximate total of 24.55 grams of cocaine. (Tr. 15-16; GX 7). Cabral also was in possession of "cut," which Detective Del Rio explained is a substance used by drug dealers to mix with cocaine in order to increase the quantity of the drugs and to make more money when the drugs are resold to customers. (Tr. 83-85). Detective Del Rio also testified that it would be unusual for an individual to purchase "cut" from a drug dealer along with cocaine. (Tr. 85). Detective Del Rio testified that an individual who purchased 25 grams of cocaine, twice a week, for personal use, would have difficulty functioning. (Tr. 85-86).

Detective O'Leary arrested Cabral and asked him to turn around so that he could be handcuffed. (Tr. 26). Before Detective O'Leary placed handcuffs on Cabral, Cabral pushed Detective O'Leary and attempted to run. (Tr. 26). Detective O'Leary called out to Detective Fowler, who was standing in Edgecomb Avenue, and Detective Fowler quickly grabbed Cabral. (Tr. 26-27). Cabral started throwing punches at Detective Fowler in an attempt to escape from Detective Fowler's grasp. (Tr. 27). Cabral struck Detective Fowler several times. (Tr. 27). Detective O'Leary came over to try to restrain and subdue Cabral so that Cabral could be arrested. (Tr. 27). He grabbed Cabral and tried to hold his arms, which caused Cabral, Detective Fowler and Detective O'Leary all to fall to the ground. (Tr. 27).

After all three individuals fell to the ground, Detective Fowler yelled out in pain and screamed that he had broken his shoulder. (Tr. 27). Cabral finally was restrained with the assistance of another NYDETF member, DEA Special Agent Waddell. (Tr. 27-28). Just after Cabral had been handcuffed, Detective Fowler stated that his left shoulder was sore, and that he could not move his arm. (Tr. 20, 28). Detective O'Leary brought Detective Fowler to Columbia-Presbyterian Hospital, where they spent approximately three hours. (Tr. 29). Later that day, when Detective Del Rio did Cabral's arrest processing, Cabral used the alias "Martin Rivera." (Tr. 16). Also, when Cabral saw Detective Fowler, who then had his left arm in a sling, Cabral knelt down and begged for forgiveness. (Tr. 18).

Detective Fowler did not return to work for three to four weeks. (Tr. 18, 29). According to medical records from physicians and physical therapists who treated Detective Fowler, he received physical therapy for approximately three weeks and was excused from work for nearly four weeks after the assault, until May 7, 2001. (GX 3-4). These records also indicated that when Detective Fowler was examined, the examination "revealed painful range of motion to the left shoulder with tenderness posteriorly" and the report described Detective Fowler's injury as a "CONTUSION—LEFT SHOULDER." (GX 4). The New City Orthopedic Group recommended "[n]o work—[l]ight arm use only." (GX 4).

The Honorable Michael B. Mukasey
December 8, 2005
Page 5

At a bench trial, Guido Cabral testified on his own behalf. He stated that he went to Amsterdam Avenue and 169th Street to purchase approximately 25 grams of cocaine after leaving his job at the New York City Public Library. (Tr. 52-53). Cabral testified that Detective O'Leary, who was in the process of placing him under arrest, "left a space" for him while Detective O'Leary spoke with Detective Fowler. (Tr. 55). Cabral admitted that when he saw this space between himself and Detective O'Leary, he started to run. (Tr. 56). Cabral also admitted that he ran away because he did not want be returned to federal court on an outstanding arrest warrant. (Tr. 56, 58). Cabral said that when he ran, one of the police officers grabbed him and threw him down to the ground. (Tr. 57). He testified that he did not strike either officer at any time, either when he tried to run or when he was on the ground. (Tr. 57). Cabral also admitted that he was using a false name—"Martin Rivera"—at the time of his arrest because of the outstanding arrest warrant in federal court. (Tr. 51).

After a bench trial, the Court ultimately found the defendant guilty on both counts of Indictment 01 Cr. 1112 (MBM). As to the assault count (Count Two), the Court concluded that Detective Fowler was a federal officer, and that Cabral "struck" Detective Fowler during an attempt to escape from Detective O'Leary and Detective Fowler. (Tr. 74). The Court concluded that Detective Fowler sustained "bodily injury" as a direct result of Cabral "having intentionally and by force resisted, opposed, impeded and interfered with Detective Fowler while the detective was behaving in his official duties, which included arresting the defendant." (Tr. 74).

The Court initially concluded that the Government had not proven Cabral guilty of the narcotics count (Count One) because the Government had not proven beyond a reasonable doubt that Cabral possessed the cocaine with an intent to distribute it to others. (Tr. 74). However, the Court allowed the Government to reopen its case. At the outset of the trial, when defense counsel was asked whether he would be "contesting intent to distribute," he replied that "we will not be contesting that [element]." (Tr. 4-5). Because the defense later argued that the Government had not proved this element, the Court permitted the Government to reopen its case and present additional testimony from Detective Del Rio and Detective O'Leary. Based on the original evidence and this additional testimony, the Court concluded that Cabral was also guilty of Count One of the Indictment. (Tr. 89-90).

## 2. The Presentence Report And The Parties' Objections

The Probation Office first determined that, pursuant to U.S.S.G. § 3D1.2(c), Cabral's failure-to-appear conviction on Indictment 96 Cr. 836 should be treated as an obstruction adjustment to Counts One and Two of Information S1 92 Cr. 315, with all three counts included in a single group, Group One. (PSR ¶ 37). Also, because Count One of Indictment 01 Cr. 1112 also involved the distribution of controlled substances, and because the offense conduct for this count is determined based on the amount of the drug involved, this count was also included in Group One, pursuant to U.S.S.G. § 3D1.2(d). (PSR ¶ 37). Group Two was composed of the

The Honorable Michael B. Mukasey
December 8, 2005
Page 6

assault count, Count Two of Indictment 01 Cr. 1112 (MBM).  (PSR ¶ 38).

        The Probation Office determined that Group One had an adjusted offense level of 34, calculated as follows: (i) a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(c)(4), because the offenses involved 5 and more, but less than 15, kilograms of cocaine; and (ii) a 2-level enhancement for obstruction of justice, based on Cabral's failure-to-appear conviction. (PSR ¶¶ 39-44).

        The Probation Office next determined that Group Two had an adjusted offense level of 25, calculated as follows: (i) a base offense level of 15, pursuant to U.S.S.G. § 2A2.2, because Cabral caused bodily injury to an officer; (ii) a 4-level enhancement, pursuant to U.S.S.G. § 2A2.2(b)(3)(B), because Cabral's offense caused Detective Fowler to sustain serious bodily injury; (iii) a 2-level enhancement, pursuant to U.S.S.G. § 2J1.7, because Cabral committed this offense while on pretrial release; and (iv) a 3-level enhancement, pursuant to U.S.S.G. § 3A1.2(b)(1), because Cabral assaulted a federal officer during the immediate flight from his arrest for a controlled substance offense.  (PSR ¶¶ 44-51).  The Probation Office stated that "[i]t appear[ed] that the defendant falsely testified at trial with regard to his actions," but nonetheless "defer[red] to the Court to determine if the enhancement for obstruction of justice applies in this case."  (PSR ¶ 50).

        The Probation Office then performed a multiple count analysis, pursuant to U.S.S.G. § 3D1.4.  (PSR ¶¶ 52-57).  Because the offense level for Group One, which was 34, was nine levels higher than the offense level for Group Two, which was 25, Group Two did not result in any increase in Cabral's offense level.  (PSR ¶¶ 52-57; see U.S.S.G. § 3D1.4).  Cabral's combined adjusted offense level was therefore 34.  (PSR ¶ 57).  Finally, because the Probation Office determined that Cabral was not entitled to any reduction for acceptance of responsibility (PSR ¶ 58), Cabral's total offense level was 34.  (PSR ¶ 61).  Cabral had no prior criminal convictions, placing him in Criminal History Category I.  (PSR ¶ 64).  The Probation Office therefore determined that Cabral faced a Sentencing Guidelines range of 151 to 188 months' imprisonment.  (PSR ¶ 94).

        Prior to sentencing, in letters submitted on August 25 and December 1, 2003, Cabral made the following presentence motions: (i) that his offense did not involve five and more kilograms of cocaine, but instead only involved one kilogram of cocaine, and that he was entitled to a hearing to dispute the PSR's findings of drug quantity; (ii) that he was entitled to a reduction in his sentence and relief from the mandatory minimum sentence, pursuant to the "safety valve" provisions set forth in Title 18, United States Code, Section 3553(f) and U.S.S.G. § 5C1.2; (iii) that he should not receive an enhancement for obstruction of justice based on his failure to appear, pursuant to U.S.S.G. § 3C1.1; (iv) that he should receive credit for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1; and (v) that he was entitled to a downward departure based on *United States* v. *Lauersen*, 348 F.3d 329 (2d Cir. 2003).

The Honorable Michael B. Mukasey
December 8, 2005
Page 7

In letters dated October 10, 2003, and January 26, 2004, the Government opposed all of Cabral's sentencing motions. The Government also asked the Court to impose a 2-level enhancement, pursuant to U.S.S.G. § 3C1.1, in Group Two, based on his false testimony at trial.

### 3.    The Court's Sentencing Rulings

In two presentencing proceedings, the Court ruled on several of the disputed sentencing issues. First, on December 3, 2003, the Court rejected the defense argument that additional corroboration or fact-finding was necessary for it to accept as true Cabral's statements during his plea allocution. (Transcript of Proceedings, December 3, 2003, at 3). The Court specifically rejected defense counsel's argument that the Government could not rely upon Cabral's statements at his 1992 plea proceeding while also rejecting the veracity of his 2002 trial testimony. (*Id*. at 2-4). The Court also held that because Cabral "pleaded guilty to failure to appear," his guilty plea "results in a grouping" and an enhancement of 2 levels for obstruction of justice. (*Id*. at 7).[3]

On January 28, 2004, Judge Mukasey ruled on other disputed sentencing issues. The Court denied the Government's request that Cabral receive a 2-level enhancement for obstruction of justice on the assault group. (Transcript of Proceedings, January 28, 2004, at 4). The Court also indicated again that it would impose a 2-level enhancement for obstruction of justice based on Cabral's failure to appear (*Id*. at 4-5) and also observed that his conduct did not "bespeak acceptance of responsibility." (*Id*. at 6). The Court stated that, with these calculations, Cabral would have an offense level of 34, which the Government observed would result in a Guidelines range of 151 to 188 months' imprisonment. (*Id*. at 5). The Court also stated that it would not grant a downward departure under *United States* v. *Lauersen*.[4] (*Id*. at 9).

### 4.    The Sentencing Proceeding

On February 6, 2004, Judge Mukasey sentenced Cabral on the Information and both Indictments. Before imposing sentence, defense counsel renewed his argument that Cabral's base offense level was overstated. Defense counsel again contended that "there is still a burden on the government for a preponderance of the evidence to indicate . . . drug amount other than what was recovered from Mr. Cabral when he was arrested" and that the Government's heavy

---

[3] Defense counsel indicated at one point that he wanted to call his client as a witness to present additional evidence about the reasons for his failure to appear at sentencing (*Id*. at 7-8), but he withdrew this request prior to sentencing, a decision that was memorialized in an order signed by the Court on January 16, 2004.

[4] The Court gave the defense an opportunity to submit further briefing on the *Lauersen* claim (*Id*. at 10), but the defense submitted no such additional briefing.

The Honorable Michael B. Mukasey
December 8, 2005
Page 8

reliance on Cabral's proffers to determine his drug quantity was unavailing. (Transcript of Proceedings, February 6, 2004 at 3). The District Court disagreed, stating that "when [Cabral] makes a statement that's clearly against his own interest, you can take it at face value[.]" *(Id.)*.

The District Court then imposed a sentence of 163 months' imprisonment, which it described as being "[t]he low end of the Guidelines range when you factor in the bail [jumping] judgment." *(Id.* at 4). This sentence was apportioned among Cabral's multiple counts of conviction as follows: (i) a 151-month sentence on Counts One and Two of Information 92 Cr. 315 to run concurrent to each other (A. 38); (ii) a 12-month sentence of imprisonment on Count One of Indictment 96 Cr. 836 to run consecutive to the terms of imprisonment imposed on Information 92 Cr. 315 (A. 46); and (iii) a 147-month term of imprisonment on Count One of Indictment 01 Cr. 1112, and a 16-month term of imprisonment on Count Two of Indictment 01 Cr. 1112, to run consecutive to each other and concurrent to the other terms of imprisonment (A. 54). This apportionment resulted in a total sentence of 163 months' imprisonment. The District Court also imposed a five-year term of supervised release (A. 39) and $400 in special assessments (A. 42, 50, 58).

### 5.    The Appeal

Cabral appealed his conviction and sentence. Cabral made three principal arguments on appeal. First, Cabral argued that his guilty plea was factually insufficient and therefore invalid pursuant to Rule 11 of the Federal Rules of Criminal Procedure. In particular, Cabral claims that his plea was inadequate because he did not admit to having agreed to distribute five and more kilograms of cocaine.

Second, Cabral's argued that his Sixth Amendment rights were violated when Detectives Del Rio and O'Leary testified about Detective Fowler's out-of-court statement that his shoulder hurt due to Cabral's assault. Cabral claimed that the admission of this testimony is contrary to the Supreme Court's decision in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), and that his rights under the Confrontation Clause of the Sixth Amendment were violated.

Third, Cabral contended that his Sentencing Guidelines range for his assault count was improperly calculated by the District Court. Cabral also contended that his sentence on this count violated the Supreme Court's decision in *Blakely* v. *Washington*, 542 U.S. __, 124 S. Ct. 2531 (2004). Cabral's principal brief on appeal was filed before the Supreme Court's decision in *United States* v. *Booker*, 125 S. Ct. 738 (2005).

The Government opposed each of Cabral's arguments, except that it consented to a remand in light of *Booker*. On June 29, 2005, the Court of Appeals affirmed Cabral's conviction and sentence in an unpublished summary order. *See United States* v. *Cabral*, No. 04-1736-cr(L), 138 Fed. Appx. 359 (2nd Cir. June 29, 2005). The Court of Appeals held that (i) Cabral's guilty

The Honorable Michael B. Mukasey
December 8, 2005
Page 9

plea was supported by an adequate factual record; (ii) the admission of the hearsay testimony was
not in violation of *Crawford*; and (iii) the District Court's ruling on the sentencing treatment of
the assault count was irrelevant because the count had no effect on Cabral's sentence. However,
the Court did remand the case for consideration of resentencing, pursuant to *United States* v.
*Crosby*, 397 F.3d 103 (2d Cir. 2005), because the District Court understandably treated the
Guidelines as mandatory, not advisory.

### B.    The Impact Of <u>Booker</u> And <u>Crosby</u>

#### 1.    <u>Booker</u>: The Guidelines Are No Longer Mandatory

In <u>Booker</u>, a five-member majority of the Supreme Court concluded that the Sixth
Amendment principles announced in <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), and <u>Blakely</u>
v. <u>Washington</u>, 124 S. Ct. 2531 (2004) apply to the Sentencing Guidelines. <u>United States</u> v.
<u>Booker</u>, 125 S. Ct. at 745-46. Specifically, in its opinion authored by Justice Stevens, the
Supreme Court held that any fact (other than a prior conviction) that is "necessary to support a
sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury
verdict must be admitted to the defendant or proved to a jury beyond a reasonable doubt." 125 S.
Ct. at 756.

A different five-member majority ruled that the appropriate remedy for the Sixth
Amendment problem described in Justice Stevens's majority opinion was to sever from the
Sentencing Reform Act 18 U.S.C.§§ 3553(b)(1) and 3742(e), and treat the Guidelines as advisory
rather than mandatory. <u>Id</u>. at 756-57. The Court also found that "despite the absence of
3553(b)(1), the [Sentencing Reform] Act continues to provide for appeals from sentencing
decisions" for "reasonableness." <u>Id</u>. at 765-66. The Court was careful to note that, although its
decision is applicable to all cases on direct review, that fact does not mean that "every sentence
gives rise to a Sixth Amendment violation" or that "every appeal will lead to a new sentencing
hearing." <u>Id</u>. at 769. To the contrary, the Court anticipated that in applying "ordinary prudential
doctrines" such as harmless error, many sentences would simply be affirmed on appeal. <u>Id</u>. In
cases not involving a Sixth Amendment violation, "whether resentencing is warranted or whether
it will instead be sufficient to review a sentence for reasonableness may depend on application of
the harmless-error doctrine." <u>Id</u>. at 769.

#### 2.    <u>Crosby</u>: Cases On Direct Appeal Will Be Remanded For Consideration Of Whether To Resentence

In <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Second Circuit, in addition
to providing substantial guidance regarding sentencing after <u>United States</u> v. <u>Booker</u>, engaged in
an extensive discussion of the appropriate disposition of cases pending on direct appeal. The
Court explained:

The Honorable Michael B. Mukasey
December 8, 2005
Page 10

> Bearing in mind the several considerations outlined above that shape
> the context in which a disposition decision is to be made, we
> conclude that the "further sentencing proceedings" generally
> appropriate for pre-<u>Booker/Fanfan</u> sentences pending on direct review
> will be a remand to the district court, not for the purpose of a required
> resentencing, but only for the more limited purpose of permitting the
> sentencing judge to determine <u>whether</u> to resentence, now fully
> informed of the new sentencing regime, and if so, to resentence. . . .
>
> A remand for determination of <u>whether</u> to resentence is appropriate
> in order to undertake a proper application of the plain error and
> harmless error doctrines.

<u>Id</u>. at 117 (emphasis in original). The Second Circuit explained that "a sentence imposed under a
mistaken perception of the requirements of law will satisfy plain error analysis if the sentence
imposed under a correct understanding would have been materially different." <u>Id</u>. at 118. The
Court concluded that "[i]f a district court determines that a nontrivially different sentence would
have been imposed, that determination completes the demonstration that the plain error test is
met." <u>Id</u>.

Accordingly, in light of <u>Booker</u> and <u>Crosby</u>, Cabral's case has been remanded by the
Court of Appeals to this Court so that this Court may decide whether to resentence Cabral in
light of the new sentencing regime. As in <u>Crosby</u>, this Court "may consider, based on the
circumstances at the time of the original sentence, <u>whether</u> to resentence, after considering the
currently applicable statutory requirements as explicated in <u>Booker/Fanfan</u> and this opinion." <u>Id</u>.
at 120 (emphasis in original).

### 3.    Sentencing After <u>Booker</u> And <u>Crosby</u>

The post-<u>Booker</u> sentencing regime differs in several important regards from the prior
regime, most prominently in that the Sentencing Guidelines are no longer mandatory. However,
while the Guidelines will no longer play a mandatory role at sentencing, they nevertheless will
continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in
enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have
committed similar crimes in similar ways." <u>Booker</u>, 125 S. Ct. at 760. In furtherance of that
goal, judges will be required to "consider the Guidelines 'sentencing range established for . . . the
applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4),
the pertinent Sentencing Commission policy statements, the need to avoid unwarranted
sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7)
(main ed. and Supp. 2004)." <u>Id</u>. at 764.

The Honorable Michael B. Mukasey
December 8, 2005
Page 11

After <u>Booker</u>, district courts are required to consider the factors set forth in Title 18, United States Code, Section 3553(a), in sentencing defendants. This provision provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

     (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)  to afford adequate deterrence to criminal conduct;

     (C)  to protect the public from further crimes of the defendant;

     (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence of the sentencing range established [in the Sentencing Guidelines]

(5)  any pertinent policy statement [issued by the Sentencing Commission]

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense

In <u>Crosby</u>, the Second Circuit explained that district courts should now engage in a three-step sentencing procedure in light of <u>Booker</u>. First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the

The Honorable Michael B. Mukasey
December 8, 2005
Page 12

facts relevant to the determination of a non-Guidelines sentence." Crosby, 397 F.3d at 112. The
Court explained that a failure to consider the Guidelines range and to instead simply select a
sentence without such consideration is error. Id. at 115. Next, the court should consider whether
a departure from that Guidelines range is appropriate. Crosby, 397 F.3d at 112. Lastly, the court
must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and
determine the sentence to impose. Id. at 113.

C.    Cabral Should Not Be Resentenced

Although the Court has the authority to resentence Cabral, the Government respectfully
submits that it should decline to do so. The factors in Section 3553(a) do not support a sentence
that is lower than the sentence of 163 months' imprisonment that Cabral received at his initial
sentencing.

1.    Cabral's Guidelines Sentence Is Appropriate And Reasonable

First, the Government contends that even after United States v. Booker, 125 S. Ct. 738
(2005), a sentence within the applicable Guidelines range will be fair and reasonable. After
Booker, district judges are still required to "consider the Guidelines 'sentencing range established
for . . . the applicable category of offense committed by the applicable category of defendant,'
§ 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid
unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1),
(3), (5)-(7) (main ed. and Supp. 2004)." Id. at 764. As Justice Breyer explained in his remedial
majority opinion, the Supreme Court expected the remaining sentencing system to "continue to
move sentencing in Congress' preferred direction, helping to avoid excessive sentencing
disparities while maintaining flexibility sufficient to individualize sentences where necessary."
Id. at 767 (citing 28 U.S.C. § 991(b)).

Here, the applicable Guidelines range was calculated pursuant to a complex,
comprehensive, and carefully calibrated set of offense and offender characteristics that, taken
together, result in a fair and just punishment. The Sentencing Guidelines advance important
interests and they continue to be relevant to each and every sentence that is to be imposed post-
Booker in order to "ensur[e] similar sentences for those who have committed similar crimes in
similar ways." Id. at 760.

Even after Booker, the determination of the Sentencing Guidelines range will continue to
be a vital part of a sentencing court's analysis. See Crosby, 397 F.3d at 113 ("[I]t is important to
bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body
of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

Indeed, this Court has held that the Guidelines range "will be a benchmark or a point of

The Honorable Michael B. Mukasey
December 8, 2005
Page 13

reference or departure" when considering a particular sentence to impose. <u>Rubenstein</u>, 403 F.3d
at 98-99. At least one other Circuit has gone so far as to hold that "any sentence that is properly
calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness."
<u>United States</u> v. <u>Mykytiuk</u>, 415 F.3d 606, 608 (7th Cir. 2005). Even recognizing that the Second
Circuit has "decline[d] to fashion any <u>per se</u> rules as to the reasonableness of every sentence
within an applicable guideline or the unreasonableness of every sentence outside an applicable
guideline," <u>Crosby</u>, 397 F.3d at 115, it must surely be the case that the overwhelming majority of
Guidelines sentences will be reasonable. This is so in large part because the Guidelines reflect
the "accumulated wisdom and experience of the Judicial Branch[.]" <u>Mistretta</u> v. <u>United States</u>,
488 U.S. 361, 412 (1989).

### 2. The Other Factors Set Forth In Section 3553(a) Do Not Support Resentencing

At any rate, a particularized consideration of the factors set forth in Section 3553(a) does
not lead to a different sentence. As discussed below, Cabral's criminal history make him a poor
candidate for any variance from the Sentencing Guidelines under Section 3553(a). Nothing in
Cabral's personal background as set forth in the Presentence Investigation Report suggests that
he should receive any reduction in his sentence.

Under Section 3553(a), the sentencing court must first consider "the nature and
circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C.
§ 3553(a)(1). Cabral has three criminal convictions, two of which were committed while he was
on bail. Cabral's initial 1991 drug crime was serious, involving distribution of more than 5
kilograms of cocaine. This case alone would have subjected Cabral to a 120-month mandatory
minimum sentence. The Government offered Cabral an opportunity to become a cooperating
witness, which Cabral accepted.

However, Cabral did not comply with the most basic rule governing his cooperation and
his federal case: he did not return to court as directed. This was no momentary lapse, swiftly
corrected with a return to court after a few days or weeks or even months. Cabral remained at
large for <u>almost nine years</u>, only to be discovered because he had committed additional crimes.

First, he was arrested in the process of completing a drug transaction. In other words,
Cabral was continuing to commit the same type of crime that led to his initial conviction.
Second, Cabral did not willingly submit to arrest. Rather, he tried to flee and initiated a violent
confrontation with two task force officers, which in turn led to an officer's injury. Third, when
the arresting officers questioned Cabral about his identity, he told them that his name was
"Martin Rivera," which bespeaks the fact that he was living under an alias while he was a
fugitive, and that even post-arrest, he tried to avoid responsibility for his crimes. This pattern of
behavior does not augur well for Cabral's rehabilitation.

The Honorable Michael B. Mukasey
December 8, 2005
Page 14

Second, Section 3553(a)(2) sets forth four criteria, none of which suggest that Cabral should have received a shorter sentence. Cabral's sentence should "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Here, Cabral's criminal misconduct is serious, not minor, and a reduced sentence will hardly promote respect for the law. Respect for the law would be poorly served by a reduction of Cabral's sentence given his multiple offenses. Nor would respect for the law be served by sentencing Cabral to the lowest possible sentence when he sought to avoid accepting responsibility for his offense by proceeding to trial on one indictment and by failing to appear for sentencing on another set of charges. To sentence Cabral to 120 months' imprisonment, or something to close to it, imposes no incremental punishment for Cabral's other serious crimes.

An additional observation is required here: Cabral's conviction for his 2001 assault and drug dealing offenses did not increase his Guidelines range by a single day. First, the 24.55 grams of cocaine that he possessed in 2001 did not increase his base offense level because his initial drug crime involved more than 5 kilograms of cocaine. Second, because the "assault group" in his Guidelines calculations was so much lower than his "narcotics group" that it dropped out in the multiple count analysis conducted pursuant to Guidelines Section 3D1.4. In other words, Cabral's Guidelines sentence, if anything, does not fully reflect his offense conduct because it does not do anything to incorporate his 2001 offenses. Given this, to impose sentence below the applicable Guidelines range would be particularly inappropriate with respect to the need to "promote respect for the law."

The sentence must also "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C). Clearly, deterrence is not served by showing leniency to Cabral, particularly given his repeated failure to comply with court orders and police instructions. Nor would a shorter sentence do anything to protect the public from Cabral. Indeed, Cabral has been unable to control his behavior even during the moments in his life when such control could have most fairly been expected: immediately after his arrest and while under court supervision. Section 3553(a)(2)(D) speaks of the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Cabral has made no showing that he cannot receive proper medical care or necessary training from the Bureau of Prisons.

As noted above, the remaining factors in Section 3553(a) refer principally to the Sentencing Guidelines and its policy statements, 18 U.S.C.§ 3553(a)(4) and (5), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). These factors plainly support a Guidelines sentence. This is particularly true given that Cabral did not accept responsibility for his 1991 offense or his 2001 offense, but instead jumped bail on the prior charges and proceeded to trial on the latter charges. To give Cabral a lower sentence will reduce or eliminate the incremental increase in his sentence and treat him more akin to a defendant who accepted

The Honorable Michael B. Mukasey
December 8, 2005
Page 15

responsibility, appeared in court, and pleaded guilty to all charges. Such a sentence suggests that, for similarly situated defendants who plead guilty, their acceptance of responsibility was an empty, meaningless gesture, as they would have received the same sentence if they had contested their guilt. Treating those who accept responsibility and those who do not on equal footing sends an unmistakable message that there is no good reason for a defendant to plead guilty or to appear in court. Finally, the need to provide "restitution to any victims of the offense" is not an issue in these proceedings. 18 U.S.C. § 3553(a)(7).

## CONCLUSION

The Court should elect not to resentence Cabral and permit his sentence of 163 months to stand undisturbed.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:

HARRY SANDICK
Assistant United States Attorney
(212) 637-2340

cc:    John Kaley, Esq. (by facsimile and mail)

Exhibit 4

# DOAR RIECK KALEY & MACK

ATTORNEYS AT LAW

JOHN JACOB RIECK, JR.
JOHN F. KALEY
WALTER MACK
————
SPECIAL COUNSEL
JOHN DOAR
————
OF COUNSEL
AMY ROTHSTEIN
EILEEN MINNEFOR
DAVID RIVERA

ASTOR BUILDING
7TH FLOOR
217 BROADWAY
NEW YORK, N.Y. 10007-2911

TELEPHONE: (212) 619-3730
FACSIMILE: (212) 962-5037
e-mail: firm@doarlaw.com

January 31, 2006

By Hand



Hon. Michael B. Mukasey
Chief Judge
United States District Court
500 Pearl Street
New York, New York 10007

Re: United States v. Guido Cabral
Docket Nos.: S1 92 Cr. 315 (MBM)
96 Cr. 836 (MBM)
01 Cr. 1112 (MBM)

Dear Chief Judge Mukasey:

## INTRODUCTION

I represent the defendant Guido Cabral in the above-referenced matters, having been appointed upon the remand of these matters to the District Court by the Second Circuit Court of Appeals. In it's Summary Order, the Court of Appeals remanded the matter to this Court for consideration of resentencing pursuant to *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005).

For the reasons set forth herein, we respectfully submit that resentencing is appropriate and that, upon resentencing, the Court should impose a sentence less severe than the 163 month sentence previously imposed.

## CABRAL'S PRIOR SENTENCING

At Mr. Cabral's sentencing on February 6, 2004, the record reflects that the Court was constrained by the then mandatory Sentencing Guidelines to impose a sentence within the

Hon. Michael B. Mukasey
January 31, 2006
Page 2

guideline sentencing range corresponding to the offense level and Criminal History Category
determined by the Court to be applicable in this case, i.e. Offense Level 34, Criminal History
Category I. The following brief colloquy, which followed argument on what was the appropriate
Guidelines for these cases, appears to reflect the Court's then considered judgment that a
Guidelines sentence was mandatory:

> "The Court:      The low end of the guidelines range when you factor in the bail
>                  judgment in 163 months.
>
> Mr. Guttlein:  Yes, your Honor.
>
> The Court:      That's what I plan to do.  Mr. Cabral is there anything you want to
>                  tell me before I impose sentence.
>
> The Defendant:  Yes, your Honor, I would like to say, I would like to ask
>                  your pardon for everything that I have done, all the bad things
>                  I have done.  I would like to ask for your compassion, and I
>                  would like an opportunity to return to my family.  That's all I
>                  have to say, your Honor.
>
> The Court:      Unfortunately, I can't give out pardons; that comes in another
>                  tribunal.  As far as compassion, *I can give you the most
>                  compassionate sentencing the guidelines allow.*  (Emphasis added).
>                  (*See* Transcript of February 6, 2004 at p.5).

The Court then imposed a Guidelines sentence of 163 months incarceration, a period of
approximately 13 ½ years.

## SENTENCING UNDER THE NOW ADVISORY GUIDELINES:
## THE COURT'S PRIOR SENTENCE CONSTITUTED
## PROCEDURAL ERROR

However, under the post *Booker/Fanfan* "advisory" guidelines now in effect, a
more compassionate approach to sentencing in this case is available if the Court is so inclined.
There are substantial reasons warranting a greater compassion and some modest reduction in the
sentence previously imposed, which reasons may not have risen to the level of "extraordinary"
sufficient to justify a downward under the pre *Booker/Fanfan* sentencing regimen but which are
appropriate for the Court's favorable consideration in a post *Booker/Fanfan* "advisory"
guidelines sentencing world.  While sentencing judges remain under a duty to "consider" the
Guidelines, they also now must consider the many factors set forth in 18 U.S.C. § 3553(a), of
which consideration of the Guidelines is only but one factor of many.  *See Crosby*, 397 F.3d at

Hon. Michael B. Mukasey
January 31, 2006
Page 3

112-13.

Because this Court was constrained by existing law at the time to impose a
Guidelines sentence, now in the wake of *Booker/Fanfan*, the Court's prior sentence constituted
"procedural" error warranting resentencing. As the Second Circuit held in *Crosby*:

> a sentencing judge would commit procedural error by <u>mandatorily</u>
> applying the applicable Guidelines range that was based solely on
> facts found by a jury or admitted by a defendant. The Court in its
> Remedy Opinion made clear that, even though the resulting
> sentence would not violate the Sixth Amendment, the judge would
> have erred by mandatorily acting under the now - excised
> requirement of subsection 3553(b)(1). A sentence explicitly based
> upon a non-existent statutory provision, even if "reasonable" in
> length, constitutes error (although possibly "harmless error" or not
> "plain error"), because of the unlawful method by which it was
> selected. (emphasis in original). *Id* at 115.

For this reason, Cabral's sentence, even assuming that it was reasonable in length, nonetheless
was unreasonable "for legal error in the method of its selection."

Additionally, for the reasons which follow, we respectfully submit that Cabral's
sentence was "unreasonable" in length and that he should be resentenced to a lesser sentence than
that previously imposed after a more expansive and uninhibited (by mandatory guidelines)
consideration of the § 3553(a) factors, to which we now turn.[1]

## SENTENCING CONSIDERATIONS

18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not
greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection."
Section 3553(a)(2) states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the

---

[1] We do not intend to repeat herein the various arguments and objections advanced by
prior counsel regarding the Guidelines calculations contained in the Presentencing Report and
made to the Court prior to Mr. Cabral's sentencing in 2004. We adopt those arguments and
assume that his Court's rulings would be the same now on remand. We only note those
arguments and objections for the record so that, to the extent not already decided by the Second
Circuit's Summary Order, they may be preserved for further potential appellate review before
that Court.

Hon. Michael B. Mukasey
January 31, 2006
Page 4

        law, and to provide just punishment for the offense;
           (B)  to afford adequate deterrence to criminal conduct;
           (C)  to protect the public from further crimes of the defendant; and
           (D)  to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most effective
manner.

        Section 3553(a) further directs the sentencing court to consider the nature and
circumstances of the offense and the history and characteristics of the defendant, the kinds of
sentences available, the need to avoid unwarranted sentencing disparities among defendants with
similar records who have been found guilty of similar conduct, and the need to provide
restitution to any victims of the offense.

        Other statutory sections also give the district court direction in sentencing. Under
18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in
determining whether and to what extent imprisonment is appropriate based on the Section
3553(a) factors, a sentencing judge is required to "recogniz[e] that imprisonment is not an
appropriate means of promoting correction and rehabilitation."

        Under 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information
concerning the background, character, and conduct of a person convicted of an offense which a
court of the United States may receive and consider for the purpose of imposing an appropriate
sentence."

        Indeed, the directives of *Booker, Crosby* and § 3553(a) now make clear that courts
must consider all of the factors in § 3553(a), many of which the Guidelines either reject or
ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and
characteristics of the defendant. Under the Guidelines, however, courts are generally forbidden
to consider the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.3,
his physical condition including drug or alcohol dependence, § 5H1.4, his employment record, §
5H1.5, his family ties and responsibilities, § 5H1.6, his socio-economic status, § 5H1.10, his
civic and military contributions, § 5H1.11, and his lack of guidance as a youth, 5H1.12. The
Guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1)
requirement that the court evaluate the "history and characteristics" of the defendant. *See Simon
v. United States*, 361 F. Supp. 35, 40 (E.D.N.Y. 2005). Additionally, in some cases, the
Guidelines will clash with § 3553(a)'s primary directive: "to impose a sentence sufficient, but not
greater than necessary, to comply with the purposes" of sentencing.

        In sum, under *Booker* and *Crosby,* the Guidelines are not binding and courts need
no longer justify a sentence outside of them by citing factors that take the case outside the
"heartland." Courts now are free to disagree, in individual cases and in the exercise of discretion,

Hon. Michael B. Mukasey
January 31, 2006
Page 5

with the actual guideline range, so long as the ultimate sentence imposed is reasonable and supported by reasons tied to the § 3553(a) factors.

An analysis of the § 3553(a) factors in this case, I think, militates in favor of Mr. Cabral and the imposition of a sentence somewhat less than that initially imposed.

## 1.    The Nature And Circumstances Of The Offense

I am not unmindful of the serious nature of Mr. Cabral's offenses. However, as I reviewed the various documents in the case file, I was struck by the fact that the quantity of narcotics at issue in this case, which triggers the mandatory 10-year minimum sentence and which drives Mr. Cabral's sentencing under the Guidelines, is based largely on post-arrest admissions by Mr. Cabral. In these statements, Cabral, who had been arrested in possession of approximately one kilogram of cocaine, which he was delivering to a purchaser in Connecticut, admitted that in the preceding 18 months, he had sold approximately 5 kilograms of cocaine, and that he had sold an additional approximately 900 grams of cocaine between December 1991 and June 1992. Based on his own admissions, Cabral later pleaded guilty to conspiring with others to distributing approximately 7 kilograms of cocaine. We point this out, not to contest those admissions and that quantity, but to make three points on this issue which we believe work in favor of Mr. Cabral and for which he should be given some credit. First, had Mr. Cabral not made post-arrest admissions and had he not cooperated with the Government, he likely would have been prosecuted for conspiring to distribute the approximately the one kilogram which he was delivering to his codefendant at the time of his arrest. That quantity of narcotics would not have triggered the 10-year mandatory minimum and likely would have resulted in a Guidelines offense level of 26, with a further 3-level reduction for acceptance of responsibility, yielding an offense level 23 and a corresponding Guidelines sentencing range of 46-57 months. It is in some significant measure that because Mr. Cabral was truthful in his admissions that his Guidelines sentencing range more than tripled.

Second, while because of his flight Mr. Cabral lost any opportunity for a 5K.1 letter from the Government, there should be some minimal recognition and acknowledgment of the fact that Mr. Cabral did cooperate and, at a minimum, provided some helpful and useful information against his co-defendant and others. It was at least in part, for that reason, that the Government was willing to enter into a cooperation agreement with him.

Lastly, while the overall quantity of approximately 7 kilograms of cocaine is substantial, it is not the huge sums seen in many cases and Mr. Cabral, who at the time of his arrest in 2001 had distributed 24 grams of cocaine, simply is not the type of significant and major drug dealer for whom lengthy double digit sentences were intended.

Again, my point is not that the crimes of plea and conviction are not serious, but

Hon. Michael B. Mukasey
January 31, 2006
Page 6

rather, that given all of the facts of the offenses, some mitigation is warranted. Were the Court to
impose the 10 year mandatory minimum on the narcotics offense and add on the some modest
increment for the bail jumping conviction and for the assault, Mr. Cabral, who will be deported
upon completion of his sentence, will, nonetheless, have received and serve a very substantial
sentence for the crimes of which he was convicted.

## 2.    The History And Characteristics Of The Defendant

Mr. Cabral is 36 years old. Mr. Cabral, who had come to the United States legally
(PSR ¶ 68), faces likely deportation to the Dominican Republic upon completion of his sentence.
He has two children (PSR ¶'s 68 and 70). Maribel Paulino, with whom Mr. Cabral has a son,
describes Cabral as a "very sensitive man" and a "good man." (PSR ¶ 70). She states that he is
hard-working (PSR ¶ 770), and a "good father." (PSR ¶ 71). Others who know him well also
offer a picture of a person capable of redemption and rehabilitation. Copies of letters from
family members and friends of Mr. Cabral are annexed hereto as Exhibit "A." They depict a
different side of Mr. Cabral, which does offer the promise of a positive future life.

Further, by all indications, Mr. Cabral, who has a high school education (PSR ¶
79), is a good worker, as reflected in the commendations he has received, some of which are
annexed hereto as Exhibit "B." There also is some indication that Mr. Cabral has had a problem
with drug abuse (PSR ¶ 76). The Court previously recommended to the Bureau of Prisons that
Mr. Cabral be placed in a drug program (*See* Transcript dated February 6, 2004 at p.7).

While in prison, Mr. Cabral has taken advantage of programs available to him.
He has completed a program for "Positive Lifestyles." He has energetically applied himself to
jobs at the several facilities where he has been held. He has done construction work (and
supervised the work of other inmates). He has completed a data processing program and, upon
completion, worked at the facility in data processing so that he could earn extra money to help
support his family "on the outside."

Mr. Cabral also has suffered his share of life's bruises. His brother died in 2000
of a gunshot wound to the mouth and brain. His mother is, and has been, ill for some time. The
mother of his daughter also has not been well. Mr. Cabral had tried to assist his family
monetarily. These realities of life are documented in the copies of the death certificate and letters
annexed hereto as Exhibit "C."

Other than the offenses of conviction here, Mr. Cabral has no prior criminal
convictions and is in Criminal History Category I.

Based on all of the facts of this case and Mr. Cabral's history, family
circumstances and personal characteristics, we respectfully submit that he is not the

Hon. Michael B. Mukasey
January 31, 2006
Page 7

sophisticated, well-off lavish-living drug offender for whom mandatory double digit lengthy
sentences were intended. A sentence, as noted above, slightly in excess of the mandatory 120
months on the narcotics charge, would, we believe, strike a fair and appropriate balance, taking
into account the facts relative both to the case and to Mr. Cabral.

### 3.    The Kinds Of Sentences Available

This consideration is not really a factor in this case. Because of the offenses of
conviction, Mr. Cabral faces a mandatory sentence of at least 10 years.

### 4.    The Guidelines Sentencing Range And Guidelines Policy Statements

The Supreme Court's decision in *Booker/Fanfan* requires sentencing courts to
treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. §
3553(a). As the Supreme Court held, the now revised Sentencing Reform Act ("SRA")

> requires a sentencing court to consider Guidelines ranges, *see* 18
> U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to
> tailor the sentence in light of other statutory concerns as well, *see* §
> 3553(a).

*Booker*, 125 S.Ct. at 757.

The issue then becomes, what weight should be given to the Guidelines. That
question was left unresolved by *Booker/Fanfan* and by *Crosby's* direction to district judges to
"consider" the Guidelines. Our view is that the Guidelines are entitled to weight no greater than
that afforded to the other factors listed in § 3553(a). Any approach that automatically gives
"heavy" weight to the Guidelines range "comes perilously close to the mandatory regime found
to be unconstitutionally infirm in *Booker*." *United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D.
Mass. 2005). *See also United States v. Ameline*, 400 F. 3d 646, 655-56 (advisory Guideline
range is "only one of many factors that a sentencing judge must consider in determining an
appropriate individualized sentence"), *adopting limited remand on reh'g en banc*, 409 F.3d 1073
(9th Cir. 2005).

> Judge Scalia explains this point in his dissent from *Booker's* remedial holding:

> [L]ogic compels the conclusion that the sentencing judge, after
> considering the recited factors (including the [G]uidelines), has full
> discretion, as full as what he possessed before the Act was passed,
> to sentence anywhere within the statutory range. If the majority
> thought otherwise - if it thought the Guidelines not only had to be

Hon. Michael B. Mukasey
January 31, 2006
Page 8

> 'considered' (as the amputated statute requires) but had generally
> to be followed - its opinion would surely say so.

*Booker*, 125 S.Ct. at 791 (Scalia, J., dissenting in part). Likewise, if the remedial majority thought that the Guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special weight to the Guidelines range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider all of the Section 3553(a) factors, not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.

Moreover, we submit that where the Guidelines conflict with other sentencing factors set forth in 18 U.S.C. § 3553(a), these statutory sentencing factors should generally trump the Guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (arguing that since 18 U.S.C. § 3553(a) requires sentence to be no greater than necessary to meet the four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates the statute and is reversible, even if within a Guidelines range).

The SRA does not state the weight that the Court should give to the Guidelines in calculating the appropriate sentence. In *Crosby*, the Second Circuit declined to rule on this question, rather it said that it would "permit the concept of 'consideration' in the context of the applicable Guidelines range to evolve as district judges faithfully perform their statutory duties." *Crosby*, 397 F.3d at 113.

District judges have differed as to the weight to be given to the Guidelines. Some district courts have found that the Guidelines should be accorded the same weight as the other SRA factors. *See, e.g., United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005) (declining to give "great weight" to the Guidelines as against the other SRA factors); *United States v. Myers*, 353 F. Supp. 2d 1026 (S.D. Iowa 2005) (same). In contrast, other courts have accorded deference to the Guidelines, and indicated that the Guidelines would continue to dictate the sentence, even though the Supreme Court held that they were now "advisory." *See, e.g., United States v. Wilson*, 350 F. Supp. 2d 910, 914 (D. Utah 2005) (holding that the Guidelines must be given "heavy weight" and concluded that "[i]n all but the most unusual cases, the appropriate sentence will be the Guidelines sentence"); *United States v. Peach*, 356 F. Supp. 2d 1018, 1022 (D.N.D. 2005) ("the Guidelines are presumptively reasonable and carry 'substantial weight' in determining an appropriate and reasonable sentence"); *United States v. Wanning*, 354 F. Supp. 2d 1056, 1060 (D.Neb. 2005) ("the Guideline range provides the presumptively reasonable sentence").

Hon. Michael B. Mukasey
January 31, 2006
Page 9

Judge Sifton in a thoughtful opinion adopted the former approach and held that the "Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a)." *Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005). Judge Sifton based his holding on three considerations: first, as noted above, the SRA does not "distinguish between the weight to be given to any of the factors;" second, "the greater the weight given to the Guidelines, the closer the Court draws to committing the act that *Booker* forbids - a *de facto* mandatory Guideline sentence based on facts found by a preponderance of the evidence by a judge;" and third, Judge Sifton recognized that there is "tension, if not conflict" between the SRA and the Guidelines. *Simon*, 361 F. Supp. 2d at 40.

With respect to the third factor enunciated by Judge Sifton, as noted above, the SRA requires the Court to consider factors such as "the history and characteristics of the defendant" (*see* 18 U.S.C. § 3553[a][1]), while the Guidelines limit the Court's consideration of such factors. Indeed, as Judge Sifton points out, under U.S.S.G. § 5H1.1-6 some factors such as age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities are not normally relevant. These same facts, however, would be relevant when determining "the history and characteristics of the defendant" as required by 18 U.S.C. § 3553(a)(1). The only resolution, we submit, is to accord these factors equal weight in crafting an appropriate sentence.

Finally, we note that under the now "advisory" Guidelines, the sentencing court is not bound by the formerly applicable departure rules when it bases its decision on the other SRA factors.

Thus, in determining an appropriate sentence in this case, we think that imposition of a Guidelines sentence gives too great weight to the Guidelines calculus and too little weight to the other factors noted herein, i.e., the relatively modest quantity of narcotics, Cabral's admissions, the fact that Cabral was a relatively small time lower level drug offender, as evidenced by his sale of 24 grams in 2001, Cabral's own drug use, his other personal and family characteristics, and the fact that Cabral faces immediate deportation after service of his sentence. Considering all of these factors, together with all of the facts of the case and Cabral's offenses (the good, the bad and the ugly), we submit that a sentence to the 10-year mandatory minimum, or slightly higher, is appropriate.

## 5.    The Need To Avoid Sentencing Disparities

Contrary to the Government's argument, we are not asking this Court to treat Mr. Cabral more leniently than a defendant who accepts responsibility for his crime and appears for sentencing as required. As noted earlier, Mr. Cabral's bad decisions have had and will have an enormous effect on his sentence. What we are asking is that the Court consider all of the factors under § 3553(a) and, in consideration of those factors, and for the reasons set forth herein,

Hon. Michael B. Mukasey
January 31, 2006
Page 10

impose a sentence less than the 163 months previously imposed. As we noted above, the drug
quantity calculations and the triggering of the mandatory 10-year minimum were determined
largely based on Cabral's own post-arrest statements and proffer admissions. His status as a
lower level narcotics offender juxtaposed against the severe mandatory minimum sentence and
other sentencing enhancements also militates in favor of some lesser sentence than 163 months.
Further, while Cabral was involved in a lower level drug offense in 2001, it would appear that
during the years of his absence, he worked and supported his family through lawful employment.
We hardly think that a sentence in the vicinity of the 10-year mandatary minimum or slightly up
from that statutory requirement is lenient; nor would such a significant sentence create any
sentencing disparity on the facts of this case.

6.    **The Need To Provide Restitution**

        The need to provide restitution is not really a factor in this case.

7.    **Reflecting The Seriousness Of The Offense, Promoting Respect For The Law,**
      **Providing Just Punishment, Deterring Criminal Conduct, Protecting The Public, And**
      **Providing Vocational Training**

        18. U.S.C. § 3553(a) requires courts to impose a sentence "sufficient, but not
greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to
provide just punishment, to afford adequate deterrence, to protect the public from further crimes
of the defendant and to provide the defendant with needed educational or vocational training. All
of these sentencing objectives can be attained by imposing a sentence at or slightly up from the
10-year mandatory minimum sentence but less than the 163 month sentence initially imposed.

        For the quantity of drugs involved in this case and the other offense conduct, the
10-year mandatory minimum is a very substantial sentence. Some additional small incremental
increase, if necessary, together with that 10-year mandatory sentence is more than adequate to
punish Mr. Cabral, who was determined in the PSR to be in Criminal History Category I, and to
satisfy the independent need of providing a just punishment. Such a sentence, so substantial as it
is, also is adequate to deter Mr. Cabral from further crimes and to protect the public. It is not
likely, that after service of such a lengthy sentence, that Mr. Cabral will commit further crimes.
Further, as noted above, Mr. Cabral, upon completion of his sentence, will be transferred to an
Immigration Detention Center and deported. For these same reasons and given these
circumstances, we submit that some adjustment to the sentence previously imposed nonetheless
will serve adequately to protect the public from further crimes by Mr. Cabral.

        Lastly, as noted in the PSR, and as reflected in the letters annexed, Mr. Cabral has
a high school education and possesses work skills. The letters annexed hereto reflect Mr.
Cabral's ability to obtain and keep lawful employment so the need to impose a lengthy sentence

Hon. Michael B. Mukasey
January 31, 2006
Page 11

to provide Mr. Cabral with vocational training is not really a factor in this case.

### CONCLUSION

       Consideration of all of the factors contained in 18 U.S.C. § 3553(a) does not warrant an "advisory" Guideline sentence of 163 months. A sentence of 10 years or some sentence only slightly north of 10 years but less than the 163 months previously imposed, is adequate to satisfy all of the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Moreover, the profile of this lower level narcotics offender, who made some terrible decisions relative to this case and who more than tripled his sentencing exposure by virtue of those bad decisions, nonetheless, given all of the circumstances relative to Mr. Cabral, his life and his offense conduct, we believe warrants some "reasonable" but lesser sentence than that previously imposed.

                            Respectfully submitted,

                            *John F. Kaley*

                            John F. Kaley

cc:    Harry Sandick, Esq.
       Asst. U.S. Attorney
       One St. Andrew's Plaza
       New York, New York 10007
       (By Hand)

# EXHIBIT A

January 13, 2006


To Whom It May Concern:



My name is Raquel Beltre, I am Guido Cabral sister, I just want to tell you a little story about our family, we were five brother and sisters before, and now we are four, because a year before my brother Guido Cabral got arrested, my other brother Julio Cabral was using drugs and committed suicide, that's was the most terrible thing ever happen to us all, but I truly think the one who took more harder was my brother Guido, because no much longer after that he was under the influence of the drugs too, I really don't know why he couldn't find any other way to get over the pain, all I can tell you, is that's what he did, I am not trying to justified him, just to said that he is being true very difficult time and did not have the strength to handle well, not everybody can deal with pain and be okay, that's why today I am writing this letter asking you for a little of your compassion and sympathy , because I know my brother Guido Cabral made a lot of mistakes but he is a good person.
Attached is a copy of a certificate of death.




Thank you for your understanding, yours'

*Raquel Beltré*

January 8, 2006

To whom it may Concern :

My name is Hector L. Andino II Rivera of 22 years of age, current resident in the island of Puerto Rico. The following letter is to certify that I know with great amount of time the following stated person: Guido H. Cabral Fernandez which is a loving, caring, responsible, homble, understanding, etc... person. This person mentioned above I consider to be my father for the fact that he raised me in exchange for nothing; even though I was his stepson. Now that he is distanced from me he still calls to check up on me to see how I'm doing, to give me strength and support to continue my way thru work and college even when times get rough. In which case I Hector L. Andino II Rivera state "that this man has showed me love thought time and there is nothing negative to say about him from my part and throughtout the 18 years that I known him". If you wish to contact me you can do so by calling the following number (787) 587-1981.

Hector L. Andino II Rivera

To whom may Concern                                    01-7-06

My name is Lucy Gutierrez and this letter is to talk about my friendship with Guido Cabral. Guido and I have been good friends since childhood. Guido has a great personality and he is very kind with others. Besides, being smart, he is also very cute and funny. Guido is a loving son as well as caring brother to his siblings

Guido loves his children and I know for a fact he is an excellent father. One of the best traits he has is that he displays a humble attitude towards others, and always trys to give the best of himself.

To whom may Concern,

The Purpose of this letter is to tell you briefly About my relationship with Mr. Guido Cabral. Guido And I have known each other for approximately about 15 years. He has always been a great friend, wonderful father with his two kids And an excellent human been. He was always to have that possitive Atlitude peom and great smile that a person need to get through out the day. Guido And his honorable family have been friend with our family for many years. If you have Any interest in Any information About our relationship please feel free to call me at: 772-336-1587

Sincerelly

Adan Castro

I, Albania Alardo have known Mr. Guido Cabral for past 20 years. As a person he is a very loving, friendly guy, with a good heart towards other people needs. Eassy person to get attach too, because of all the love, pacient and honest friendship that he offer you. I am so glad I known him for 20 years.

Thank you
Albania Alardo.

To whom may concern;                                                1/6/06

My name is Sandra Gutierrez and
this letter is to inform you about
my wonderful friend Guido Cabral.
I known him since he was very
young. He is a great person, who
came from a honest and hard
working family. Guido also is a
father of two beautiful children
whom need him desperately.
Guido and I attended high school
together and he was a honor
student. He is a fourth to the
oldest five children. Guido had always
care about the well seem of
his family. We shared many
happy memories, he is a very
special person for me and I am
glad God put him and his
family in my path.

Sincerelly
Sandra Gutierrez

January 03, 2006

To Whom It May Concern:

I Gregoria Maria Castellanos owner of Maria's Flowers and Gift Shop
located at 270 South Broadway Yonkers, New York 10705 have known Mr.
Guido Cabral for over 14 Years.

Mr. Cabral lived at my residence for more than a year, giving me the
opportunity to get to know him better. He was always very punctual and
responsible with his job and a very loving and caring father.

In my opinion I think he's entitled to another opportunity in life.

Sincerely,

Gregoria M.Castellanos

January 06, 2006

To Whom It May Concern:

It is difficult to write about somebody you love and no to be influence for your feelings but I am going to try to do exactly just that, my brother, Guido Cabral, made huge mistakes and we all know that even himself is accepting his responsibilities and paying for them, all I am concerning here is what he did not do and is being accused of, because I am so sure that no matter how many mistakes he make one thing he is incapable of doing is attacked somebody, so, all I am trying to said here is above all the wrong doing, my brother is a good person and deserve another chance.

Thank you for your understanding,

Sincerely yours,

Raquel Beltre



# TERCERA IGLESIA CRISTIANA

**(Discípulos de Cristo)**
**Third Church Disciples of Christ**

January 13, 2006

To Whom It May Concern:

Re: G. Cabral, Inmate No. 10612-014

I am writing this hopeful letter to you with a sense of confidence in God's mercy and trusting in our justice system. Also, I am writing with a deep hope in your clemency on behalf of Mr. Cabral and his mother, Ms. Tejada.

I have known this family (Mr. Cabral and his mother) for the last ten (10) years as a member of our community in New York. Based on my pastoral relationship and interaction with Mr. Cabral and family, I feel comfortable and confident giving my testimony on behalf of this young man, asking for his clemency.

Mr. Cabral acknowledges his mistake against the society and is deeply repented about the damage that he has committed against himself and the society we live in and wants to start a new life facing his citizen's responsibility and willing to give all his support to his family and surrounding society. He also recognizes the suffering that he has caused to his mother and due to her poor health conditions, he wants to be a new, free citizen to honor his mother, his God, and this country.

I also expect that your mercy will be beyond the limits to give to this young man an opportunity to start a new life, making amends and contributions to our society. Since Mr. Cabral has been in prison, it has modified his character, mind, sense of life and his old way of being. Mr. Cabral regrets his past of unproductive conduct and he is willing to build a new future for the benefit of our society and his family as well.

I hope that you will be able to look favorable upon him. My sincere thanks for your clemency, concern and response to our petition on behalf of Mr. Cabral.

Respectfully,

Rev. Rafael Rivera-Rosa
Pastor

# EXHIBIT B



# *May it be known*

### *by all who read this, that this certificate has been*

## *presented to*

Martin Rivera

*for*

Completition of Danyl vending machines model 5000D

*Presented this*

15    *Day of*

MARCH,98



Certificate of Achievement

This Certificate is presented to

by L.G.g – Copico

Martin Rivera

for Distinguished Achievement

IN WITNESS WHEREOF, we have caused this Certificate to be signed

this 24 day of June in the year 1998

Steve Harrington
Signature

Fercok Zorilla
Signature

Copyright 1999 Artistic Office Products

# Certificate of Award

*May it be known that this certificate has been presented to*

Martin Rivera

*For Outstanding Achievement in*

Technician of the month

*Presented this* 25 *Day of* January

1999



Certificate 90302

# CERTIFICATE OF

# ACHIEVEMENT

*This Award is Presented to*

Martin Rivera

*in Recognition of Distinguished Achievement in*

customer relationship

*and by Recommendation of the Committee on Awards has been granted this certificate.*

*Given at*    copico

*this*    10    *day of*    November    *in the year*    1999    .

Signature

Signature

A-500

©E-Z LEGAL FORMS®    00065-4



22 Water Street
Cambridge, MA 02141

August 21, 2001

Mr. Martin Rivera
27 Ludlow Street
Apt. 4B
Yonkers, NY 10705

Dear Mr. Rivera:

Please accept this letter as verification of your employment at Mac-Gray Co. as a full time Service Technician.    Your start date was December 4, 1997 and worked through May 25, 2001.  Your salary at the time you left was $11.81 per hour.

If you need further information, you can reach me at 617-492-4040.

Sincerely,

Christa Barkley
HR Generalist

e just got easier.

WATER STREET • CAMBRIDGE, MASSACHUSETTS  02141          PHONE: (617) 492-4040    FAX: (617) 492-5386



Frank Zorrilla
FIELD SERVICE MANAGER

| | |
|---|---|
| PH: | (508) 660-9229 |
| | (800) 726-2679 |
| FX: | (508) 660-9234 |
| CELL: | (917) 416-3337 |
| EMAIL: | fzorrilla@macgray.com |

# Copico

Te copier vending company
Division of Mcgray

Life just got easier.

10 WALPOLE PARK SOUTH
WALPOLE, MA 02081

September 24, 2001

To whom it may concern:

Dear Sir or Madam:  .

It is with pleasure that I recommended Martin Rivera.  I have known him for 4 years.

I had the opportunity of working with Mr. Martin Rivera as his supervisor since he started with this company in December of 1997.

He was organized, efficient, and willing to do whatever was needed to get particular task finished.

Because of his cooperative attitude and good cheer, he was promoted from a paper loader to a copier technician and in that position, he did a great job, always going beyond his duties to be a good support to the service department.

Mr. Rivera was able to have a good communication with our clients helping them to understand the equipment and keeping customer satisfaction.

Mr. Rivera, would be an asset to any organization, and I am happy to give him my wholehearted endorsement.

Sincerely,

Frank Zorrilla  917-416-3337
Frank Zorrilla
Field Service Manager

# EXHIBIT C

NEW YORK STATE
DEPARTMENT OF HEALTH

# CERTIFICATE
# OF DEATH

RECORDED
**5901**
REGISTER NUMBER

| 1. NAME: FIRST | MIDDLE | LAST | 2. SEX. MALE ☒₁ FEMALE ☐₂ | 3A. DATE OF DEATH: MONTH 04 DAY 27 YEAR 00 | 3B. HOUR: Found 10:00 A m |
|---|---|---|---|---|---|
| Julio | Cesar | Cabral | | | |

| 4A. PLACE OF DEATH: (Check only one) HOSPITAL DOA ☐ ER ☐ | HOSPITAL OUTPATIENT ☐₂ | HOSPITAL INPATIENT ☐₃ | NURSING HOME ☐₄ | PRIVATE RESIDENCE ☒ | OTHER (Specify) ☐ | 4B. IF FACILITY, DATE ADMITTED. MONTH DAY YEAR |
|---|---|---|---|---|---|---|

| 4C. NAME OF FACILITY: (If not facility give address) 18 COYLE PLACE #1B | 4D. LOCALITY: (Check one and specify) CITY OF ☒ VILLAGE OF ☐ TOWN OF ☐ YONKERS | 4E. COUNTY OF DEATH WESTCHESTER |
|---|---|---|

| 4F. MEDICAL RECORD NO. M2000-0908 | 4G. WAS DECEDENT TRANSFERRED FROM ANOTHER INSTITUTION? (If yes, specify institution name, city or town, county and state) NO ☒ YES ☐ |
|---|---|

| 5. DATE OF BIRTH: MONTH 02 DAY 21 YEAR 1965 | 6. AGE: 35 yrs. IF UNDER 1 YEAR months days | IF UNDER 1 DAY hours minutes | 7A. CITY AND STATE OF BIRTH: (Country if not U.S.A.) Dominican Republic | 7B. IF AGE UNDER 1 YEAR, NAME OF HOSPITAL OF BIRTH: |
|---|---|---|---|---|

| 8. SERVED IN U.S. ARMED FORCES? NO ☒ YES ☐ (Specify years) | 9. RACE: (Black, White, etc.) White | 10. HISPANIC ORIGIN? NO ☐ YES ☒ Dominican | 11. DECEDENT'S EDUCATION (Specify highest grade completed) Elementary/Secondary (0-12) College (1-4 or 5+) |
|---|---|---|---|

| 12. SOCIAL SECURITY NUMBER: N/A | 13. MARITAL STATUS: NEVER MARRIED ☐ MARRIED OR SEPARATED ☒₂ WIDOWED ☐₃ DIVORCED ☐₄ | 14. SURVIVING SPOUSE: (If wife, provide maiden name) Milagros Alejo |
|---|---|---|

| 15A. USUAL OCCUPATION: (Do not enter retired) TAXI DRIVER. | 15B. KIND OF BUSINESS OR INDUSTRY: Livery. | 15C. NAME AND LOCALITY OF COMPANY OR FIRM: |
|---|---|---|

| 16A. RESIDENCE, STATE: New York | 16B. COUNTY: Westchester | 16C. LOCALITY: (Check one and specify) CITY OF ☒ VILLAGE OF ☐ TOWN OF ☐ Yonkers | 16F. IF CITY OR VILLAGE, IS RESIDENCE WITHIN CITY OR VILLAGE LIMITS? ☐ YES ☐ NO IF NO, SPECIFY TOWN: |
|---|---|---|---|

| 16D. STREET AND NUMBER OF RESIDENCE: 18 Coyle Place | 16E. ZIP CODE: 10705 |
|---|---|

| 17. NAME OF FATHER: FIRST Julio MI Cesar LAST Cabral | 18. MAIDEN NAME OF MOTHER: FIRST Simeona MI LAST Tejada |
|---|---|

| 19A. NAME OF INFORMANT: Simeona Tejada | 19B. MAILING ADDRESS: (Include zip code) 508 W. 135th ST #4B NY NY 10031 |
|---|---|

| 20A. NAME OF CEMETERY, CREMATION, REMOVAL OR OTHER DISPOSITION: (Specify) Burial | MONTH 05 DAY 01 YEAR 00 | 20B. PLACE OF BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION: Oakland Cem. | 20C. LOCATION: (City or town and state) Yonkers, NY |
|---|---|---|---|

| 21A. NAME AND ADDRESS OF FUNERAL HOME: RG Ortiz C.H. 4425 Broadway New York, NY | 21B. REGISTRATION NUMBER: 2087 |
|---|---|

| 22A. NAME OF FUNERAL DIRECTOR: Luisa Pena | 22B. SIGNATURE OF FUNERAL DIRECTOR: Luisa Pena | 22C. REGISTRATION NUMBER: 03952 |
|---|---|---|

| 23A. SIGNATURE OF REGISTRAR: Valerie M.O. | 23B. DATE FILED: MONTH 05 DAY 29 YEAR 00 | 24A. BURIAL OR REMOVAL PERMIT ISSUED BY: Kathleen T. Wahl | 24B. DATE ISSUED: MONTH 04 DAY 29 YEAR 00 |
|---|---|---|---|

**ITEMS 25 - 33 COMPLETED BY CERTIFYING PHYSICIAN** — OR — **ITEMS 25 - 33 COMPLETED BY CORONER OR MEDICAL EXAMINER**

| 25A. TO THE BEST OF MY KNOWLEDGE, DEATH OCCURRED AT THE TIME, AND PLACE AND DUE TO THE CAUSES STATED. SIGNATURE: MONTH DAY YEAR | 25A. ON THE BASIS OF INVESTIGATION AND SUCH EXAMINATIONS, AS I FELT NECESSARY, IN MY OPINION DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSES STATED. SIGNATURE AND TITLE: Duc Duang MD | ☐ CORONER ☐ CORONER'S PHYSICIAN ☒ MEDICAL EXAMINER |
|---|---|---|

| 25B. THE PHYSICIAN ATTENDED THE DECEASED | 25C. LAST SEEN ALIVE BY ATTENDANT: | 25B. PRONOUNCED DEAD ON MONTH 04 DAY 27 YEAR 00 | 25C. HOUR: 12:15 Pm | 25D. DATE SIGNED: MONTH 04 DAY 27 YEAR 00 |
|---|---|---|---|---|

| 25D. NAME OF ATTENDING PHYSICIAN: | FROM MONTH DAY YEAR TO MONTH DAY YEAR | MONTH DAY YEAR | 25E. SIGNATURE OF CORONER OR CORONER'S PHYSICIAN, IF OTHER THAN CERTIFIER: |
|---|---|---|---|

| 25D. ATTENDING PHYSICIAN LICENSE NUMBER | 25F. ME/COR. PHYS. LICENSE NUMBER 165926 |
|---|---|

| 26. NAME AND ADDRESS OF CERTIFIER WHO SIGNED 25B Duc V. Duong, MD, Westchester County Medical Examiner's Office, Valhalla, NY |
|---|

| 27. MANNER OF DEATH: NATURAL CAUSE ☐₁ ACCIDENT ☐₂ HOMICIDE ☐₃ SUICIDE ☒₄ UNDETERMINED CIRCUMSTANCES ☐₅ PENDING INVESTIGATION ☐₆ | 28. WAS CASE REFERRED TO CORONER OR MEDICAL EXAMINER? NO ☐₀ YES ☒₁ | 29A. AUTOPSY? NO ☐₀ YES ☒₁ REFUSED ☐₂ | 29B. IF YES, WERE FINDINGS USED TO DETERMINE CAUSE OF DEATH? NO ☐₀ YES ☒₁ |
|---|---|---|---|

**CONFIDENTIAL**    SEE INSTRUCTION SHEET FOR COMPLETING CAUSE OF DEATH    **CONFIDENTIAL**

| 30. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), and (C).) | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| PART I. IMMEDIATE CAUSE: (A) GUNSHOT WOUND TO MOUTH AND BRAIN. | |
| DUE TO OR AS A CONSEQUENCE OF: (B) | |
| DUE TO OR AS A CONSEQUENCE OF: (C) | |
| PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A). | |

| 31A. IF INJURY, DATE: MONTH DAY YEAR | HOUR: m | 31B. LOCALITY: (City or town and county and state) | 31C. DESCRIBE HOW INJURY OCCURRED: |
|---|---|---|---|

| 31D. PLACE OF INJURY: | 31E. INJURY AT WORK? | 32. WAS DECEDENT HOSPITALIZED IN LAST 3 MONTHS? | 33A. IF FEMALE, WAS DECEDENT PREGNANT IN LAST | 33B. DATE OF DELIVERY: |
|---|---|---|---|---|

(left margin, vertical) CAUSE OF DEATH 10:00 AM DATE OF DEATH 4/27/00

St. Luke's
Roosevelt

University Hospital of
Columbia University College
of Physicians & Surgeons

**St. Luke's-Roosevelt**
**Hospital Center**
St. Luke's Division
1111 Amsterdam Avenue
New York, NY 10025

Jan. 9, 2006.

Re: Simona Tejeda.

To whom this may concern:

Ms. Tejeda is a well known, long time patient in the Roosevelt Medical Clinic, who suffers from chronic debilitating conditions. Her son's current legal situation has a great effect upon her psycho-physical well being. Any considerations that can be given to rejoin her with her son would be of great benefit for her recovery and quality of life. Any questions please contact me at your convenience.

Respectfully,

Dr. P. Baez

Lt. med.

**Continuum** Health Partners, Inc.



**Medicina General**
DR. Edwin Lopez

Nombre: _MIRNA RIVERA QUIÑONES_

Direccion: _____

Edad: _42 AÑOS_ Fecha: _5 - JANUARY - 2006_

To whom it may concern :

   I'm Dr. Edwin López Santiago Lic#9776
Head physician certify that the patient MRS.
MIRNA RIVERA Quiñones of 42 years old
presents history of "Rectum-Vaginal post-
partum fistula" from Dic-12-1983 and
for this reason she has suffered 10 surgeries
and 3 proceedures and diagnostic studies and
including she is actualy evaluated for a
posible quirurgic intervention at cause of...

Dr. Edwin López Santiago
                          9776

DM _____     _____

BC _____     LIC _9776___



# Medicina General
## DR. Edwin Lopez

Nombre: _MIRNA RIVERA QUIÑONES_

Direccion: _____

Edad: _42 AÑOS_ Fecha: _5 - JANUARY - 2006._

Continuation:

..... during years complication of
"Rectum - Vaginal post-partum fistula". This
condition has affected her in great
way her physical, mental and emotional
status, being nesesary that she
received support from "MR. Guido H.
Cabral Fernandez", father of her daughter
"Giannasca Cabral Rivera" of 14 years
old.

Dr. Edwin Lopez Santiago

9776

DM _____

BC _____  LIC _9776_

Exhibit 5

6297CABC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                              01 Cr. 1112

5  GUIDO CABRAL,

6               Defendant.

7  ------------------------------x

8                                          February 9, 2006
                                           9:45 a.m.
9

10  Before:

11                   HON. MICHAEL B. MUKASEY
                                            District Judge
12

13                        APPEARANCES

14  MICHAEL J. GARCIA
        United States Attorney for the
15      Southern District of New York
    BY:  HARRY SANDICK
16      Assistant United States Attorney

17  JOHN KALEY
        Attorney for Defendant
18
    ALSO PRESENT:  ELENA RICH, Spanish Interpreter
19

20

21

22

23

24

25

6297CABC

```
 1            (Case called)
 2            (In open court)
 3            MR. SANDICK:  Harry Sandick for the government.  Good
 4   morning, your Honor.
 5            MR. KALEY:  John Kaley for Mr. Cabral.  Good morning,
 6   Judge.
 7            THE COURT:  Good morning.  This is on a remand,
 8   correct?
 9            MR. KALEY:  Yes.
10            THE COURT:  Mr. Kaley, what's your pleasure?
11            MR. KALEY:  Your Honor, I had submitted a letter to
12   the court dated January 31.
13            THE INTERPRETER:  Your Honor, just a second, please.
14            Ready, your Honor.  Sorry.
15            MR. KALEY:  Your Honor, I had delivered a letter dated
16   January 31.  I had delivered it by hand to the courthouse.
17            THE COURT:  I got your January 29 letter in which you
18   asked for more time.
19            MR. KALEY:  I think I asked for two more days, your
20   Honor.
21            THE COURT:  Right.
22            MR. KALEY:  I have a copy.  And if the court would be
23   inclined, I wouldn't oppose putting this over a day or two to
24   give your Honor a chance to consider it.  In fact I would make
25   that request, Judge.
```

6297CABC

1              THE COURT:  Mr. Sandick, have you seen this?

2              MR. SANDICK:  I have seen it, your Honor, and I have

3       had a chance to review it.

4              THE COURT:  Is there anything you want to tell me with

5       respect to it?

6              MR. SANDICK:  Not much that is really unique to this

7       case, your Honor.  There is obviously a decision the court has

8       to make about whether or not to resentence, looking at the

9       facts as they were known to the court at the time of

10      sentencing.  In the government's view the guidelines range here

11      is a fair range, it fairly measures the culpability here.  The

12      defendant committed crimes in the early 1990s that led to the

13      imposition of a ten year mandatory minimum sentence for a drug

14      count.  Subsequent to that he jumped bail and was at large for

15      approximately nine years.

16             I think Mr. Kaley asks in substance for a ten year

17      sentence.  It's the government's view that a ten year sentence

18      doesn't adequately reflect the culpability here because it

19      would essentially put him in the same position he was in had he

20      not jumped bail.

21             In addition, the court will probably recall there was

22      a bench trial in this matter about three and a half years ago

23      before your Honor concerning the circumstances of his rearrest.

24      He was arrested while in possession of a small quantity of

25      cocaine which indicates that he was continuing to deal drugs

6297CABC

1    while he was a fugitive from justice.  Secondly, after he was

2    arrested for that small amount of cocaine he tried to flee,

3    punched an officer --

4              THE COURT:  That was the one where there was a tussle

5    with the officer who was injured.

6              MR. SANDICK:  Exactly.

7              THE COURT:  I recall the bench trial.

8              MR. SANDICK:  And ultimately as the guidelines

9    calculation sorted out, because of the seriousness of the drug

10   offense, the underlying assault offense basically dropped out

11   as a result of the analysis under 3D1.4.  That of course was

12   proper, an the court's ruling was entirely correct, and the

13   Circuit affirmed the sentencing apart from the Crosby issue.

14             But bearing that in mind, to sentence to a

15   nonguidelines range, lower than the guidelines range, in the

16   government's view doesn't give any weight to that incident.  In

17   fact even if some of the factors that Mr. Kaley talks about as

18   sort of counterbalancing factors, that suggest there should be

19   a lower range, in the government's view the fact that the

20   assault conviction didn't add one day to his sentence certainly

21   mitigates in favor of the guidelines range sentence rather than

22   a reduction from that sentence.  Again, a lower sentence in the

23   government's view would not fairly measure his true culpability

24   for the range of offenses he committed.  And all of that is

25   notwithstanding the fact that Mr. Cabral, like most defendants

6297CABC

1    in this courthouse, has a family who cares about him, whose

2    imprisonment is a real hardship.

3         In the government's view, even apart from the family

4    circumstances departure type issues, even under 3553(a), it

5    doesn't support a lower sentence here.  It's something that if

6    it supported a lower sentence would likely almost as a

7    categorical matter would support a lower sentence in many, many

8    cases, and that can't be what Congress intended or what the

9    Supreme Court intended in *Booker* when they made 3553(a) the

10   central statute for sentencing.

11        Other than that, I would be happy to answer questions,

12   but I don't have any other thoughts.

13        MR. KALEY:  Your Honor, we address many of the things

14   Mr. Sandick has said in our letter to the court.  Basically,

15   your Honor, this is here on a remand.  At the imposition of the

16   initial sentencing your Honor indicated at the time that you

17   would give Mr. Cabral the most compassionate sentencing the

18   guidelines allowed, and the court imposed a sentence of 163

19   months.

20        In my letter to your Honor we point out several

21   reasons why I believe that there is some room for some

22   additional compassion here in this particular case, so that Mr.

23   Cabral could receive a sentence of maybe slightly more than 120

24   months, which would take into account the other offenses, but

25   less than 163 months previously imposed by your Honor.

6297CABC

1          In this case, Judge, as I pointed out, Mr. Cabral had

2     signed a cooperation agreement, and the driving factor in this

3     case as to the quantity of narcotics is largely based on

4     admissions that Mr. Cabral made himself after his arrest back

5     in 1991.  At that time he did enter into a cooperation

6     agreement with the government, and I assume that his

7     cooperation had some value.

8          I'm not asking the government for a 5K letter.  I

9     recognize that that is not going to happen, but I think at a

10    minimum there should be at least some recognition of the fact

11    that the driving force in the guideline was Mr. Cabral's own

12    admissions.  Had Mr. Cabral just not said anything, not

13    cooperated, been arrested for the one kilogram of cocaine that

14    he was in possession of at the time of his arrest, his

15    guideline sentencing range would have been in the vicinity of

16    46 to 57 months.  Because at that time Mr. Cabral was truthful

17    with the agents -- and I believed that the government accepted

18    what he said was true, because they did enter into a

19    cooperation agreement with him -- he acknowledged a quantity

20    slightly in excess of five kilos.  I believe it was seven

21    kilos, your Honor.  That of course triggered the mandatory

22    minimum ten year sentence.

23         So we have a situation here where, granted, Mr. Cabral

24    didn't show up for sentencing.  I'm not here to excuse that in

25    any way or to attempt to explain it.  I'm only asking your

6297CABC

1    Honor for some consideration taking into account that the

2    driving force behind the sentence Mr. Cabral received, which is

3    almost triple what he would have received had he just kept his

4    mouth closed and pleaded guilty to the one kilo that he was

5    arrested with, is a significant factor.  And I think it does

6    give the court some leeway here.

7              THE COURT:  Mr. Sandick, do you dispute that the

8    principle driving force behind the calculation of quantity was

9    information that came from Mr. Cabral himself?

10             MR. SANDICK:  It was, your Honor.  I'm not sure that

11   all of it was post-cooperation.  My recollection is that he

12   also made a post-arrest statement.  My recollection is that he

13   was facing (b)(1)(B) drug charges when the case came here as a

14   Rule 20 from Connecticut and that's subsequent to his arrival

15   here.  He entered into a cooperation agreement which required

16   him to plead guilty to additional conduct, raising it to a

17   (b)(1)(A).

18             THE COURT:  And he didn't get a 5K letter.

19             MR. SANDICK:  He did not get a 5K letter.  Earlier in

20   the case, much earlier, I had conferred with the assistants and

21   agents who were involved in the investigation.  I'm not sure

22   that at the time that he left he would have qualified for a 5K

23   letter.  It would also be the government's view that even if it

24   was true that he had provided some assistance, certainly his

25   departure in becoming a fugitive from justice --

6297CABC

1          THE COURT:  Well, I don't doubt that.  I mean that
2     undermined that completely.  All right.
3          MR. KALEY:  Basically, as I have said, your Honor, and
4     I think as the court perceives, what has ratcheted up Mr.
5     Cabral's guidelines were his own post-arrest and cooperation
6     admissions.  He would have been looking at a sentence in the 46
7     to 57 month range with an offense level 23 after three levels
8     for acceptance of responsibility.
9          So he knows, your Honor, that he made some bad
10    decisions here, and those decisions, as bad as they are,
11    basically tripled his sentence.  And so what we're asking your
12    Honor for is at this point in time we know that he is facing
13    the mandatory minimum of ten years on the narcotics charge,
14    that is a very, very substantial sentence, designed I think
15    for, you know, more substantial and significant drug dealers
16    than Mr. Cabral.  In 2001 when he was arrested, your Honor, he
17    had 24 grams.  We're not talking about a huge quantity.
18          THE COURT:  Well, people rarely carry around huge
19    kilogram quantities of drugs on their person.
20          MR. KALEY:  That's true.  I think what happened here,
21    if I recall correctly from the transcript, is the agents had
22    observed Mr. Cabral meeting with a number of people in the
23    vicinity of his arrest, and when he was arrested he had a
24    number of small packets wrapped in tin foil, a number of those
25    packets, perhaps ten or more, which totaled about 24 grams.  I

6297CABC

1   do think we're dealing, your Honor, here with a lower-level

2   drug dealer, and a ten year sentence for his quantity of drugs

3   is a very substantial sentence.

4          As I pointed out in my letter, Judge, of course

5   immediately upon completion of his sentence Mr. Cabral is going

6   to be deported, and he will be taken to an immigration lock-up

7   and deported from the United States.  So as I looked at all of

8   the facts of the case, Judge, and all of the factors that we're

9   directed to take into account under 3553(a), I thought there

10  was some room for some added compassion from your Honor between

11  163 months that you previously imposed and the 120 month

12  mandatory sentence.

13         I mean Mr. Cabral in the PSR is in Criminal History

14  Category I.  His life in the letters that I have attached, your

15  Honor, does reflect that there is a real possibility here for

16  some redemption and for some productive years.  He had worked

17  gainfully in a number of positions, as some of the letters

18  attached attest.  Like most people in life, your Honor, he has

19  had some bumps and bruises along the way.  His brother

20  committed suicide back in 2000, his mother is ill, the mother

21  of his daughter is ill.  I'm just asking your Honor when you

22  consider everything -- the nature of the offense, his personal

23  characteristics -- that perhaps there is some room for, to use

24  the court's words initially at sentencing, some more compassion

25  in sentencing in this particular case.

6297CABC

1          We have set all of those things forth, your Honor, in

2     our letter, and I think the overarching point here is that the

3     court should impose a sentence sufficient but not greater than

4     necessary as required by 3553(a).

5          THE COURT:  When do you want to come back?

6          MR. KALEY:  I could come back Tuesday morning, your

7     Honor, or late Tuesday afternoon.

8          MR. SANDICK:  Your Honor, I'm supposed to be before

9     the Circuit that morning at 10 a.m. and also the following

10    morning.  I could meet later in the morning, perhaps at 11:30,

11    or of course any time during the day.

12         MR. KALEY:  I can come any time on the 16th or 17th if

13    that would be convenient.

14         MR. SANDICK:  I am available all day on each of those

15    days, your Honor.

16         MR. KALEY:  That would actually be preferable, your

17    Honor.

18         THE COURT:  Why don't we say then the 16th, which is

19    the Thursday.

20         MR. KALEY:  That's fine.

21         MR. SANDICK:  Thank you very much, your Honor.

22         MR. KALEY:  What time, Judge?

23         THE COURT:  Same time as now.

24         All right.  See you on the 16th.

25         (Adjourned to February 16, 2006 at 9:15 a.m.)

62sdcabs

                              SENTENCE

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                 02 Cr. 1112 (MBM)

5    GUIDO CABRAL,

6                    Defendant.

7    ------------------------------x

8
                                                 February 28, 2006
9                                                9:45 a.m.

10
     Before:
11
                         HON. MICHAEL B. MUKASEY,
12
                                                 District Judge
13

14                            APPEARANCES

15   MICHAEL J. GARCIA
          United States Attorney for the
16        Southern District of New York
     BY:  HARRY SANDICK
17        Assistant United States Attorney

18   JOHN KALEY
          Attorney for Defendant
19

20        - also present -

21   Mirta Hess,
          Spanish Language Interpreter
22

23

24

25

62sdcabs

SENTENCE

1      THE CLERK:  U.S. v. Guido Cabral.

2      Counsel, please state your name for the record,

3  beginning with the government.

4      MR. SANDICK:  Harry Sandick for the government.

5      Good morning, your Honor.

6      THE COURT:  Good morning, Mr. Sandick.

7      MR. KALEY:  John Kaley for Mr. Cabral.

8      Good morning, your Honor.

9      THE COURT:  Good morning.

10     Mr. Sandick, have you seen Mr. Kaley's January 31

11  letter?

12     MR. SANDICK:  Yes, I have, your Honor.

13     THE COURT:  Anything you want to tell me?

14     MR. SANDICK:  No, your Honor.  I believe at the last

15  conference I made certain comments.  The gist of them was --

16  the gist of the government's view is that already in his

17  guidelines range sentence, because of the fact that the assault

18  count from the 2002 trial was at a sufficiently lower offense

19  level compared to his drug count, that did not lead to any

20  increase in his overall sentence, and that is the way the

21  guidelines are calculated and the government doesn't dispute

22  that.  But to reduce his sentence further, to reduce his

23  sentence now on this *Crosby* remand would further devalue the

24  significance of that 2002 conviction.

25     And what that conviction relates to is the fact that

62sdcabs

SENTENCE

1    not only did Guido Cabral commit the offense, as he did, in the

2    early 90s and not only did he jump bail and remain a fugitive

3    but he continued to commit crimes right up to the time of his

4    arrest.  When he was finally arrested, almost certainly aware

5    of the fact that he was going to be brought back to federal

6    custody, he tried to flee.  He assaulted an officer.  This just

7    isn't the kind of person who under 3553(a), considering his

8    history and characteristics, should get any sort of a discount

9    from his guidelines range, despite the personal circumstances

10   that Mr. Kaley describes.

11          In terms of those, Mr. Cabral is similarly situated to

12   most defendants who come before your Honor who have families

13   who are perhaps collateral victims of the defendant's own

14   foolish acts and that is certainly the case here, but that

15   doesn't entitle him to any reduction in his sentence.

16          THE COURT:  Mr. Kaley.

17          MR. KALEY:  Yes, your Honor.  Thank you.

18          As I indicated the last time, your Honor, Mr. Cabral

19   is well aware that he has made some mistakes.  The matter is

20   again before your Honor because of a *Crosby* remand.  The Court

21   may recall that at the initial sentencing proceeding the Court

22   was justifiably constrained by the guidelines then in effect

23   which were mandatory.  Now that the guidelines are advisory, I

24   do think that there is some room for some added compassion with

25   respect to Mr. Cabral.

62sdcabs
### SENTENCE

1        I say that not to lessen the seriousness of his crimes

2    of conviction.  I say that only because looking at the entirety

3    of this case, I think there is some room for a sentence less

4    than 163 months previously imposed.  And as I pointed out in my

5    letter, what has driven this case in large measure was

6    Mr. Cabral's own post-arrest cooperation admissions as to

7    quantity.  Had Mr. Cabral not cooperated with the government

8    but simply pled guilty to the one kilogram of cocaine with

9    which he had been arrested, his sentence would have been

10   somewhere in the vicinity of 46 to 57 months under the then

11   mandatory guidelines.  Because he --

12       THE COURT:  Well, he did that in the hope of achieving

13   a still lesser sentence.  This was supposed to be a case in

14   which the defendant was going to cooperate.  He then fled

15   instead of pursuing the cooperation.

16       MR. KALEY:  I do think, your Honor, that he did

17   cooperate in some respects.  I believe he provided information

18   against the other person who was arrested with him in

19   Connecticut at the time.  He provided information regarding the

20   source of his supply and others.  And I do believe that the

21   period of his cooperation had extended for some period of time

22   prior to his flight.

23       I'm not looking to make excuses for the flight.  It

24   was a terrible decision.  I only point out that his bad

25   decisions have magnified what otherwise would have been perhaps

5

62sdcabs

## SENTENCE

1   an appropriate sentence for the crime of arrest.  And in this

2   particular case, he has, as the Court points out, he has lost

3   the 5K letter that he otherwise might have received, and, in

4   effect, his sentence has tripled compared to where he was on

5   the day of his arrest.

6        And we just think that under all the circumstances of

7   this case that now that the guidelines are advisory and not

8   mandatory, that there is some room for some mitigation from the

9   163-month sentence.  And in asking for that, I don't mean to

10  lessen the seriousness of the conviction in 2002, but given

11  that the guideline range jumped five years to the mandatory 120

12  months, or more than five years based on Mr. Cabral's own

13  admissions, I do think there is some room for some added

14  compassion on the Court's part here.

15       Mr. Cabral, these experiences are his first brushes

16  with the law.  He is in Criminal History Category I as a result

17  of these convictions.  His work record and family record

18  indicate that he is a person who has been able to work, has

19  some skills, and I think that there is a good likelihood that

20  upon completion of his sentence, Mr. Cabral can have some

21  productive years.  And those years, of course, as the Court

22  realizes, will not be here in the United States; Mr. Cabral

23  faces immediate deportation to the Dominican Republic upon the

24  completion of his sentence.

25       I have appended to my letter, your Honor, some letters

62sdcabs
SENTENCE

1    from --

2         THE COURT:  I have read them.

3         MR. KALEY:  -- family and friends, and they do

4    indicate that there is a person inside of Mr. Cabral who is

5    capable of doing some good things notwithstanding all the bad

6    choices and the crimes that he has committed which brings him

7    here today.  But I do think that there are some positive

8    possibilities here.  He strikes me as a person who recognizes

9    that he made some terrible mistakes and as a person with the

10   capacity to be rehabilitated.

11        And when I look at 3553(a) and the statute's direction

12   to the court to impose a sentence sufficient but not greater

13   than necessary to satisfy the aims of the statute, and taking

14   into account all the facts here, including the assault on the

15   officer but also including Mr. Cabral's cooperation and his

16   admissions and the fact that the guidelines and the mandatory

17   minimum is largely driven by his own admission, I think there

18   is some room, your Honor, for a sentence in the vicinity of 112

19   months.

20        THE COURT:  All right.  Mr. Sandick.

21        MR. SANDICK:  Your Honor, if I can just reply briefly

22   on the subject of the cooperation?

23        Just first the timeframe.  It really did not proceed

24   for very long.  His case was Rule 20'd to this district on

25   April 20, 1992.  He pleaded guilty here before your Honor on

62sdcabs
                         SENTENCE

1   July 22nd of 1992, and he failed to appear at a court

2   conference in November of '92.  So the cooperation really only

3   proceeded for a matter of a few months.  It was not extensive.

4        I also at an earlier point in these proceedings before

5   the first sentencing conferred with the line assistant who was

6   the line assistant in 1992, and she advised me that at the time

7   when Mr. Cabral left, he had not yet provided what amounted to

8   substantial assistance.  And so in the government's view, a

9   reduction based on cooperation here really isn't appropriate.

10       Of course, even if he had provided some --

11       THE COURT:  I don't think Mr. Kaley is asking for a

12  reduction based on cooperation because you know, and as

13  everybody here knows, it can't be given without a letter from

14  the government, and obviously what you are telling me, with

15  exclamation points, is that the government isn't making that

16  application and would not have made it at the time based on

17  what he did up until then.

18       MR. SANDICK:  I am saying that, your Honor.

19       I also make the comments, I suppose in an abundance of

20  caution, I can think of at least one of your Honor's colleagues

21  who has taken the view that after the *Booker* decision that --

22       THE COURT:  The 5K1 is out of existence?

23       MR. SANDICK:  Not that it is out of existence but that

24  under 3553(a) a judge can make an independent evaluation, and,

25  of course, that wouldn't lead to the mandatory minimum being

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

62sdcabs
SENTENCE

1    waived but that at least one of your colleagues has taken that

2    approach.  And so I make those comments just in an abundance of

3    caution.

4         I think there are other good legal reasons why even

5    after *Booker* courts should still give substantial weight to the

6    government's decision.  It sounds like I may not need to make

7    this point any stronger here.

8         THE COURT:  No, I am not going to give consideration

9    to cooperation.  I think that is uniquely a matter to be

10   evaluated by the government.  I am not in a position as a

11   matter of institutional competence and I don't think that I am

12   institutionally competent to weigh his cooperation.

13        It seems to me, though, that it is not unreasonable

14   for me to weigh the fact that his guidelines range is in fact

15   driven by his cooperation in that his admissions have taken it

16   up to the 120-month mandatory minimum and then beyond.

17        You don't dispute that, do you?

18        MR. SANDICK:  I don't dispute that, your Honor.

19        When he was -- I believe the terms of his Rule 20, the

20   terms of what he was going to plead to in Connecticut but then

21   was going to plead to here was a (b)(1)(B) five-year mandatory

22   minimum offense and, of course, he wound up pleading to a

23   ten-year mandatory minimum offense.

24        THE COURT:  I am going to consider that, and the

25   cooperation apparently from what you are telling me was not

62sdcabs
SENTENCE

1    substantial so I am not going to consider that.  But the fact

2    that his admissions had the effect of multiplying the guideline

3    range I think is something that I should consider and do

4    consider.

5         But as Mr. Sandick points out, I have to make sure

6    that the facts of the circumstances of his flight and his

7    apprehension are not diminished and written off.  And so what I

8    am going to do is impose a sentence of 132 months, which is 120

9    months plus the 12 for the additional activity after the

10   conviction, as a reasonable sentence under 3553(a), considering

11   the circumstances of the various offenses involved here and not

12   only their commission but also their discovery by the

13   government.  I believe that is a reasonable sentence.  All

14   other terms will remain as they were.

15        I will tell Mr. Cabral that he has a right to appeal

16   if he believes there is any irregularity in connection with his

17   resentencing here, and if he cannot afford counsel to prosecute

18   an appeal, one will be appointed at public expense to represent

19   him.

20        Is there anything else?

21        MR. SANDICK:  Not from the government.  Thank you,

22   your Honor.

23        MR. KALEY:  One moment, please, your Honor.

24        (Pause)

25        I think Mr. Cabral just wanted to express his thanks,

62sdcabs
                            SENTENCE

 1   your Honor.

 2          THE COURT:  Tell Mr. Cabral that I did what I thought

 3   the law and the various standards involved here reasonably

 4   required.  I would just as cheerfully have done something else

 5   if I thought that was necessary.  So no thanks are necessary,

 6   but in any event, I accept the thanks for which they are

 7   offered.

 8          MR. KALEY:  He appreciates your Honor's consideration

 9   and he knows that he has made mistakes and looks forward to

10   completing the sentence.

11          THE COURT:  I hope he makes good and becomes a

12   productive member of the public when he gets back into the

13   community.

14          MR. KALEY:  Thank you, your Honor.

15                              -   -   -

16

17

18

19

20

21

22

23

24

25

Exhibit 6

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

SOUTHERN                                District of                        NEW YORK

UNITED STATES OF AMERICA           **JUDGMENT IN A CRIMINAL CASE**
V.
Guido Cabral
                                   Case Number:          01CR01112 -01 MBM

                                   USM Number:

                                   John Kaley / Ausa Harry Sandick
                                   Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

X was found guilty on count(s)    One (1) and Two (2)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC §(b)(1)© | Distribution of Cocaine | 4/10/01 | 1 |
| 18 USC §§111(a)(1) & 111 (b) | Resisting Arrest | 4/10/01 | 2 |

The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

February 28, 2006
Date of Imposition of Judgment

Signature of Judge

Honorable Michael B. Mukasey, United States District Judge
Name and Title of Judge

4/21/06
Date

U.S. DISTRICT COURT
FILED
APR 2 1 2006
S. D. OF N.Y.

Rev. 06/05) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __5__

ENDANT:        Guido Cabral
SE NUMBER:    01CR01112 -01 MBM

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:      132 Months.

All other conditions remain as previously set at the time of imposition of sentence Feb 3, 2004.
Defendant shall be housed in a facility as close to the NYC area as possible dependant on his security classification and availability of acommodations. The defendant shall apply for all programs for which he may qualify for.

The court makes the following recommendations to the Bureau of Prisons:

**x**   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐ a.m.   ☐ p.m.   on _____

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

(Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | | | | |
|---|---|---|---|---|
| | Judgment—Page | 3 | of | 5 |

DEFENDANT:      Guido Cabral
CASE NUMBER:    01CR01112 -01 MBM

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :     3 years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X  **The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

☐  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

(Rev. 06/05) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___4___ of ___5___

DEFENDANT:         Guido Cabral
CASE NUMBER:       01CR01112 -01 MBM

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 200.00 | $0.00 | $ 0.00 |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |

| TOTALS | $ _____ $0.00 | $ _____ $0.00 |
|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐  the interest requirement is waived for the    ☐ fine   ☐ restitution.

   ☐  the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ev. 06/05) Judgment in a Criminal Case
eet 6 — Schedule of Payments

DANT:     Guido Cabral
NUMBER:   01CR01112 -01 MBM

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   x   Lump sum payment of $   200.00           due immediately, balance due

    ☐   not later than _____ , or
    ☐   in accordance   ☐ C,   ☐ D,   ☐   E, or   ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

DEFENDANT:        Guido Cabra
CASE NUMBER:      01CR01112 -01 MBM
DISTRICT:         S.D.N.Y.

# STATEMENT OF REASONS
### (Not for Public Disclosure)

**VI  COURT DETERMINATION FOR SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM**
(Check all that apply.)

A    **The sentence imposed is** (Check only one.):
    x  below the advisory guideline range
    ☐ above the advisory guideline range

B    **Sentence imposed pursuant to** (Check all that apply.):

  1    **Plea Agreement** (Check all that apply and check reason(s) below.):
      ☐ binding plea agreement for a sentence outside the advisory guideline system accepted by the court
      ☐ plea agreement for a sentence outside the advisory guideline system, which the court finds to be reasonable
      ☐ plea agreement that states that the government will not oppose a defense motion to the court to sentence outside the advisory guideline system

  2    **Motion Not Addressed in a Plea Agreement** (Check all that apply and check reason(s) below.):
      ☐ government motion for a sentence outside of the advisory guideline system
      ☐ defense motion for a sentence outside of the advisory guideline system to which the government did not object
      ☐ defense motion for a sentence outside of the advisory guideline system to which the government objected

  3    **Other**
      X  Other than a plea agreement or motion by the parties for a sentence outside of the advisory guideline system (Check reason(s) below.):

C    **Reason(s) for Sentence Outside the Advisory Guideline System** (Check all that apply.)

  X  the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)
  ☐ to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))
  ☐ to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))
  ☐ to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))
  ☐ to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D))
  ☐ to avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6))
  ☐ to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))

D    **Explain the facts justifying a sentence outside the advisory guideline system.** (Use page 4 if necessary.)

    Defendant's own disclosure and attempt at cooperation disclosed conduct that mandated a 10 year mandatory minimum instead of a five year mandatory minimum. A sentence of 120 months plus an additional 12 months for flight, for a total of 132 months, is sufficient in these circumstances.

DEFENDANT:        Guido Cabra,
CASE NUMBER:      01CR01112 -01 MBM
DISTRICT:         S.D.N.Y.

# STATEMENT OF REASONS
### (Not for Public Disclosure)

## VII  COURT DETERMINATIONS OF RESTITUTION

A    ☐    Restitution Not Applicable.

B        Total Amount of Restitution:    _____

C        Restitution not ordered (Check only one.):

1    ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

2    ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

3    ☐    For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

4    ☐    Restitution is not ordered for other reasons.  (Explain.)

D    ☐    Partial restitution is ordered for these reasons (18 U.S.C. § 3553(c)):

## VIII  ADDITIONAL FACTS JUSTIFYING THE SENTENCE IN THIS CASE (If applicable.)

Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony cases.

| | |
|---|---|
| Defendant's Soc. Sec. No.:  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 | Date of Imposition of Judgment<br>February 28, 2006 |
| Defendant's Date of Birth:  June 23, 1969 | |
| Defendant's Residence Address:  27 Ludlow Street  Apt 4B<br>Yonkers, NY 10705 | Signature of Judge<br>Honorable Michael B. Mukasey, United States District Judge |
| Defendant's Mailing Address:  same as above | Name and Title of Judge<br>Date Signed    4/28/06 |

Exhibit 7

UNITED STATES DISTRICT COURT **JUDGE WOOD**
SOUTHERN DISTRICT OF NEW YORK
——————————————————————X

GUIDO CABRAL,

                Petitioner,

    -against-

UNITED STATES OF AMERICA,

                Respondent.
——————————————————————X

**08 CV 00296**

**ORDER**

Petitioner, who is appearing *pro se* and is presently incarcerated in the Reeves Correctional Institution or the Reeves County Detention Center, a private, state, or local correctional facility in Pecos, Texas, that is contracted by the Federal Bureau of Prisons, brings a motion to vacate, set aside or correct a federal sentence under 28 U.S.C. § 2255.[1] Petitioner's request to proceed *in forma pauperis* is granted. Petitioner brings this motion, seeking a "correction" of his release date from imprisonment with regard to judgments of conviction and associated sentences issued form this Court. (Motion at 5); <u>United States v. Cabral</u>, Nos. 01 Cr. 1112, 96 Cr. 836, 92 Cr. 315 (MBM) (S.D.N.Y.). Petitioner is directed to comply with the instructions listed below.

**DISCUSSION**

<u>**Characterizing This Motion**</u>

Granting this *pro se* motion the liberal interpretation which it is due, <u>see Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994) (*pro se* submissions are read liberally "and . . . interpret[ed] . . . to raise the strongest arguments that they suggest"), it appears that Petitioner brings this motion in order to

———————————————

[1] The Court's *Pro Se* Office received this motion on November 19, 2007. For the reasons discussed below, Cabral will be referred to as Petitioner rather than Movant.

1

challenge the manner in which his federal sentence(s) is/are being executed. Such challenge(s), however, must be made in a petition for a writ of habeas corpus brought under 28 U.S.C. § 2241. See Cook v. New York State Div. of Parole, 321 F.3d 274, 278 (2d Cir. 2003). The United States Court of Appeals for the Second Circuit has cautioned the district courts against converting mislabeled submissions into motions to vacate, set aside or correct federal sentences under § 2255, in light of sections 105 and 106 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, Title I, §§ 105, 106, 110 Stat. 1220-21 (1996), codified at 28 U.S.C. §§ 2244, 2255, which prohibit second or successive § 2255 motions and habeas corpus petitions brought under 28 U.S.C. § 2254. Adams v. United States, 155 F.3d 582, 583-84 (2d Cir. 1998) (per curiam). In Adams, the Second Circuit held that:

> district courts should not recharacterize a motion purportedly made under some other rule as a motion made under § 2255 unless (a) the movant, with knowledge of the potential adverse consequences of such recharacterization, agrees to have the motion so recharacterized, or (b) the court finds that, notwithstanding its designation, the motion should be considered as made under § 2255 because of the nature of the relief sought, and offers the movant the opportunity to withdraw the motion rather than have it so recharacterized.

Adams, 155 F.3d at 584. Later, the Supreme Court ruled that

> [i]n such circumstances the district court must notify the *pro se* litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion will be subject to the restrictions on "second or successive" motions, and provide the litigant an opportunity to withdraw the motion or to amend it so that it contains all the § 2255 claims he believes he has. If the court fails to do so, the motion cannot be considered to have become a§ 2255 motion for purposes of applying to later motions the law's "second or successive" restrictions.

Castro v. United States, 540 U.S. 375, 383 (2003). The Adams holding has been extended to mislabeled submissions wherein the relief sought can only be provided via a habeas corpus petition brought under § 2241. See Simon v. United States, 359 F.3d 139, 143-44 (2d Cir. 2004).

As stated above, it appears to the Court that Petitioner challenges the execution of his

abovementioned federal sentence(s). See Burgos, 14 F.3d at 790. Thus, any subsequent § 2241 petition filed by Petitioner, wherein Petitioner challenges the execution of his abovementioned federal sentence(s), could be considered a "second or successive" petition under the AEDPA. Therefore, to the extent Petitioner wishes to challenge the execution of his abovementioned federal sentence(s), Petitioner is directed to submit an amended petition for habeas corpus relief under § 2241 to the Court's *Pro Se* Office within sixty (60) days of the date of this order wherein he specifies his intent to challenge the execution of his abovementioned federal sentence(s) and lists the grounds for such challenge(s) under federal law. If Petitioner does not wish to have this action recharacterized as one brought under § 2241, he may submit a request to have the action withdrawn, in writing, to the Court's *Pro Se* Office, within sixty (60) days of the date of this order.

## Proper Venue Of A § 2241 Action

It is well-settled that in order to entertain a habeas corpus action under § 2241, a court must have jurisdiction over the custodian of the litigant bringing the petition, and that the proper respondent for a § 2241 action is that litigant's custodian. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 494-95 (1973) (writ of habeas corpus does not act upon the prisoner who seeks relief, but upon his or her custodian); see also Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004) ("[L]ongstanding practice confirms that in habeas challenges to present physical confinement[,] . . . the default rule is that the proper respondent is the warden of the facility where the prisoner is being held[.]"). The custodian is the warden of the prison or facility where the prisoner is held or the official in charge of the facility that has day-to-day control of the prisoner. Padilla, 542 U.S. at 435; Yi v. Maugans, 24 F.3d 500, 507 (3d Cir. 1994).

As discussed above, Petitioner is incarcerated in the Reeves Correctional Institution or the Reeves County Detention Center, located in Pecos, Reeves County, Texas, within the Western District

3

of Texas. 28 U.S.C. § 124(d)(6). Thus, Petitioner is advised that, to the extent he seeks habeas corpus relief under § 2241, the proper venue for such an action appears to be the United States District Court for the Western District of Texas, and the proper respondent appears to be Warden of the Reeves Correctional Institution or the Reeves County Detention Center. Petitioner is further advised that should he submit to the Court an amended § 2241 petition, and should it be determined that this Court is the wrong venue, this Court may dismiss, or if it be in the interest of justice, transfer this action to the correct venue. See 28 U.S.C. § 1406(a). Should Petitioner believe that any amended § 2241 petition submitted to this Court would be submitted to the wrong venue, he may inform this Court's *Pro Se* Office, in writing, within sixty (60) days of the date of this order, of his request to have this action withdrawn, and of his intent bring a new § 2241 action in the United States District Court for the Western District of Texas, wherein he would name the abovementioned Warden as the respondent.[2]

## CONCLUSION

Accordingly, Petitioner is directed to comply with this order as specified above. No response shall be required at this time, and all further proceedings shall be stayed for sixty (60) days or until Petitioner has complied with this order. Petitioner is advised that any amended § 2241 petition submitted should be captioned as an "Amended Petition" and bear the same docket number as this

---

[2] Petitioner is advised that a litigant who submits a § 2241 petition, wherein he seeks to challenge the execution of a federal sentence, must normally allege facts demonstrating how he has exhausted all of the administrative remedies available to him prior to submitting such a petition. Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001); United States v. Cleto, 956 F.2d 83, 84 (5th Cir. 1992) (per curiam). If a litigant is unable to demonstrate that he exhausted the available administrative remedies prior to bringing such an action, he may allege facts demonstrating why such failure to exhaust should be excused. See Guitard v. Sec'y of the Navy, 967 F.2d 737, 741 (2d Cir 1992); Fuller v. Rich, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam) (quoting Hessbrook v. Lennon, 777 F.2d 999, 1003 (5th Cir. 1985)).

4

order.[3]  Petitioner is advised that any amended § 2241 petition shall completely replace, not supplement, Petitioner's original motion. If Petitioner fails to comply with this order within the time allowed, or fails to show good cause as to why he cannot comply with this order within the time allowed, **this action will be characterized as one brought under § 2241**. As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c); Lozada v. United States, 107 F.3d 1011, 1016-17 (2d Cir. 1997), abrogated on other grounds by United States v. Perez, 129 F.3d 255 (2d Cir. 1997).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

KIMBA M. WOOD
Chief Judge

Dated:   **JAN 1 4 2008**
New York, New York

---

[3] For Petitioner's convenience, attached to this order is a § 2241 amended petition form. Petitioner can use this form in order to comply with the Court's order.

5